**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THE STATE OF OHIO,** *et al.* | : | |
| | : | **Case No. 2:15-cv-321** |
| **Plaintiffs,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Norah McCann King** |
| **UNITED STATES OF AMERICA,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

In its most recent challenge to the Patient Protection and Affordable Care Act of 2010, commonly known as "Obamacare," the State of Ohio takes aim at a lesser-known provision from the law—one designed to stabilize prices in the individual insurance market during the first three years of the Act's guaranteed-issue and community-rating reforms. *See* 42 U.S.C. § 18061 (known as the "Transitional Reinsurance Program"). Those guaranteed-issue and community-rating reforms, which provide some of the best-known and most essential features of the Affordable Care Act, prohibit insurers from denying coverage or charging higher premiums because of an individual's pre-existing medical conditions. *See id.* §§ 300gg, 300gg-1, 300gg-3; *King v. Burwell*, 135 S. Ct. 2480, 2485-86 (2015) ("The Patient Protection and Affordable Care Act adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market. First, the Act bars insurers from taking a person's health into account when deciding whether to sell health insurance or how much to charge."); Annie L. Mach & Bernadette Fernandez, Cong. Research Serv., R42069, *Private Health Insurance Market Reforms in the Affordable Care Act (ACA)* 3-5 (2014).

1

Because the guaranteed-issue and community-rating reforms extended healthcare insurance to anyone, regardless of their health status, Congress worried that adverse selection (*i.e.*, the tendency for high-risk individuals to buy health insurance and low-risk individuals not to) might lead to proportionally fewer low-risk enrollees, which in turn could cause spikes in insurance premiums.  *See* 42 U.S.C. § 18061(c)(1).  As a result, Congress established the Transitional Reinsurance Program to offset (partially) the cost of insuring high-risk enrollees during benefit years 2014, 2015, and 2016.  *See id.* § 18061(b)(1).  Under the Transitional Reinsurance Program, Congress sought to stabilize premiums in the reformed marketplace by collecting contributions from health insurance issuers and group health plans and then using those contributions to fund reinsurance payments to individual-market issuers that cover high-risk (and thus, high-cost) enrollees.  *Id.*  In other words, Congress enacted a three-year program designed to reduce premiums for individuals and ensure market stability for insurers while they first adjusted their actuarial estimates to some of the milestone reforms from the Affordable Care Act—*i.e.*, to avoid "death spirals" that would cripple the insurance market.

The State of Ohio and a handful of its instrumentalities and political subdivisions (collectively, "the State") take umbrage with the Transitional Reinsurance Program, at least insofar as it applies to them.  (*See* Pls.' Am. Compl., ECF #13, PageID 59).  The State claims that the health plans it provides to its employees are not required to make reinsurance contributions because the plans are not "group health plans" within the meaning of the Affordable Care Act.  (*Id.* at ¶ 40).  Alternatively, the State contends that requiring its health plans to make these contributions violates the Tenth Amendment and the Intergovernmental Tax Immunity Doctrine—two separate components of what the State collectively refers to as "structural" federalism.  (*Id.* at ¶¶ 98-99).

Accordingly, the State argues that this Court should order the federal government to remit any payments the State has made under the Transitional Reinsurance Program; set aside any regulations purporting to apply the program to state or local governmental entities; and enjoin the federal government from collecting any further payments from the State under the program. (*Id.* at ¶ 100).

The State of Ohio, however, is no stranger to Affordable Care Act challenges. To the contrary, the State's Attorney General proudly trumpets that his first act in office was joining a twenty-five state lawsuit challenging the Act in its entirety. *See* Ohio Attorney General, http://www.ohioattorneygeneral.gov/About-AG/Mike-Dewine (last visited Nov. 6, 2015). The Supreme Court of the United States ultimately rebuffed the thrust of that lawsuit, upholding the individual healthcare mandate in the process. *See Nat'l Fed. of Indep. Bus. v. Sebelius (NFIB)*, 132 S. Ct. 2566, 2594-2600 (2012). The Supreme Court did, however, strike down some of the Medicaid expansion provisions from the Affordable Care Act as unduly coercive under the Constitution's Spending Clause, thus handing Ohio a partial victory. *Id.* at 2601-07.

In 2014, Ohio redoubled its efforts against the Affordable Care Act by leading nineteen states in filing a friend-of-the-court brief in support of a challenge to the contraception-coverage mandate. *See* Brief of Amici Curiae States of Michigan, Ohio, & 18 Other States for Conestoga, Hobby Lobby, Mardel, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) (Nos. 13-354, 13-356), 2014 WL 3338885. There, the challengers notched a partial victory, as the Supreme Court held that the Religious Freedom Restoration Act of 1993 prohibits the federal government from demanding that closely held corporations provide health-insurance coverage for contraception when doing so violates the sincerely held religious beliefs of the companies' owners. *Hobby Lobby*, 134 S. Ct. at 2759.

3

The State sat out the third Affordable Care Act challenge to reach the Supreme Court, *King v. Burwell*, 135 S. Ct. 2480 (2015).  There, the Court rejected an assault on the law's provision of premium tax credits to low- and moderate-income Americans who happened to reside in states that chose not to establish independent insurance exchanges.  *Id.* at 2496.  In the process, the Court flatly noted that "Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them."  *Id.*

But the respite did not last long.  Ohio soon joined nineteen other states in urging the Supreme Court to reject an administrative accommodation from the Affordable Care Act for non-profit religious colleges, hospitals, and charities that raise faith-based objections to birth control.  *See* Brief of the States of Texas, Ohio, et al. as Amici Curiae Supporting Petitioners, *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 136 S. Ct. 446 (2015) (No. 15-105), 2015 WL 5029191.  Although seven of eight federal appeals courts have ruled in the federal government's favor on this issue, Ohio pressed on, and the Supreme Court granted certiorari to resolve the apparent circuit split.  *See* Adam Liptak, *Supreme Court to Hear Another Case on Contraception and Religion*, N.Y. Times, Nov. 7, 2015, at A11.

Now, the State takes aim at the Transitional Reinsurance Program.  As with much of the State's previous challenge in *NFIB*, however, this shot misses the mark.  Put simply, Congress intended for *all* group health plans, including those operated by state or local governments, to pay into the Transitional Reinsurance Program.  The text, structure, and purpose of the Affordable Care Act (and related statutes) confirm as much.  Moreover, Congress and the Department of Health and Human Services did not violate the Constitution when they subjected health plans offered by state and local government employers to the same requirements as those offered by private-sector employers.

4

Because the State of Ohio's claims fail as a matter of law, the Court **GRANTS** the federal government's Motion to Dismiss this lawsuit and **DENIES** the State's Motion for Summary Judgment.

## I.  BACKGROUND

Congress enacted the Affordable Care Act (or "ACA" for short) to address longstanding concerns over the lack of affordable, universally available healthcare.  The ACA contained several provisions that, by now, have become ingrained in the nation's conscience, through either headline-grabbing litigation or personal experience.  These features include the guaranteed-issue and community-ratings provisions described above, 42 U.S.C. §§ 300gg, 300gg-1, 300gg-3; the requirement that most individuals pay a tax penalty if they fail to maintain coverage, I.R.C. § 5000A; federal tax credits that help low- and moderate-income Americans purchase health insurance, I.R.C. § 36B; and a provision allowing younger Americans to stay on their parents' healthcare plans until they reach age twenty-six, 42 U.S.C. § 300-gg-14.

The ACA also included a lesser-known provision, the Transitional Reinsurance Program, to help ease the move to a healthcare system where insurance carriers could no longer discriminate against high-risk individuals in the individual market.  *See* 42 U.S.C. § 18061.  This program targeted volatility and price increases in the individual market as insurers adjusted (perhaps imperfectly at first) to different risk pools.  *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014 (Final Rule), 78 Fed. Reg. 15,410, 15,411 (Mar. 11, 2013).  In other words, the Transitional Reinsurance Program sought "to protect against [insurance] issuers' potential perceived need to raise premiums due to the implementation of the 2014 market reform rules, specifically [the] guaranteed availability [provisions]" for high-risk enrollees.  *Id.* at 15,467.

To accomplish these goals, the ACA requires each state, or the Department of Health and Human Services ("HHS") on the state's behalf, to establish a reinsurance program under which:

> (A)  health insurance issuers, and third party administrators on behalf of group health plans, are required to make payments to an applicable reinsurance entity for any plan year beginning in the 3-year period beginning January 1, 2014 . . . ; and
>
> (B)  the applicable reinsurance entity collects payments under subparagraph (A) and uses amounts so collected to make reinsurance payments to health insurance issuers described in subparagraph (A) that cover high risk individuals in the individual market (excluding grandfathered health plans) for any plan year beginning in such 3-year period.

42 U.S.C. § 18061(b)(1); *see also id.* § 18041(a)(1)(c), (c)(1) (establishing HHS's authority to create reinsurance programs for states that decline to do so).  In Ohio, as in most other states, the federal government operates the reinsurance program on the state's behalf.

The ACA provides that the total contribution amounts should yield an estimated $25 billion over the three-year life of the program, and those revenues are earmarked for two purposes: (1) $20 billion in "aggregate contribution amounts" that directly fund the reinsurance program; and (2) an additional $5 billion which "shall be deposited into the general fund of the Treasury of the United States and may not be used for the [reinsurance] program . . . ."  *See id.* § 18061(b)(3)(B)(iii), (b)(3)(B)(iv), and (b)(4).[1]  The ACA also permits the collection of an additional, unspecified amount to fund the administrative expenses of operating the program. *Id.* § 18061(b)(3)(B)(ii).

---

[1] Although § 18061(b)(3)(B)(iv) earmarks an additional $5 billion for the general treasury, HHS notes that this "is the same amount as that appropriated for the Early Retiree Reinsurance Program under section 1102 of the Affordable Care Act"—a stopgap measure designed to discourage employers from dropping coverage for early retirees not yet eligible for Medicare while some of the ACA's other reforms took effect.  *See* Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2014 (Proposed Rule), 73,118, 73,154 (Dec. 7, 2012); *see also* Stephen Koff, *DeWine May Sue Over Obamacare Payments*, The Plain Dealer (Cleveland), Jan. 16, 2015, at A6 ("In addition, the [reinsurance] program was to collect more money . . . as a way of funding another ACA feature, called the Early Retiree Reimbursement Program.").

The ACA requires payments from two different contributing entities—"health insurance issuers" and "group health plans." *Id.* § 18061(b)(1)(A).[2]  The term "health insurance issuer" covers insurance companies, insurance services, and insurance organizations (including HMOs) licensed by state regulators, but it "does not include a group health plan." *Id.* § 300gg-91(b)(2). The term "group health plan," in turn, means "an employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income Security Act of 1974 [29 U.S.C.A. § 1002(1)]) to the extent that the plan provides medical care . . . to employees or their dependents . . . directly or through insurance, reimbursement, or otherwise." *Id.* § 300gg-91(a)(1).

The contribution that health insurance issuers and group health plans owe is based on their enrollment count multiplied by a predetermined contribution rate for the applicable benefit year.   45 C.F.R. § 153.405(a).  Contributing entities maintain responsibility for self-reporting their enrollment counts.  *Id.* § 153.405(b).  For the 2014 benefit year, the required contribution rate was $63.00 per enrollee.  *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016 (Final Rule), 80 Fed. Reg. 10,750, 10,773 (Feb. 27, 2015).  That figure dropped to $44.00 per enrollee in benefit year 2015, and will drop further to $27.00 per enrollee in benefit year 2016.  *Id.*  Contributing entities may make their payments in one lump-sum on the Fifteenth of January following each benefit year (*i.e.*, January 15, 2015; January 15, 2016; and January 15, 2017), or they may defer one-sixth of their payment until November Fifteenth of each payment year.  *Id.*

---

[2] For group health plans, the applicable "contributing entity" means the plan itself, "although [the plan] may elect to use a third party administrator or administrative services-only contractor for transfer of the reinsurance contributions."  45 C.F.R. § 153.20.  The definition of "contributing entity" has changed over time with respect to group health plans.  For the 2014 benefit year, self-insured group health plans were required to make contributions regardless of whether those plans used a third party administrator.  *Id.*  HHS revised its approach for benefit years 2015 and 2016, however, by limiting the definition of "contributing entity" to those self-insured group health plans that use a third party administrator.  *Id.*

The State of Ohio and several of its instrumentalities and political subdivisions have paid their contributions to the Transitional Reinsurance Program for benefit year 2014 under protest. (*See* Pls.' Am. Compl., ECF #13, ¶¶ 53-69).  For example, on January 15, 2015, the State transferred roughly $5.4 million to the federal government for its self-reported count of 85,540 enrollees covered by the Ohio self-insured plan.  (*Id.* at ¶¶ 58-59).  Likewise, the four state universities who joined this suit (The University of Akron, Shawnee State University, Bowling Green State University, and Youngstown State University) have transferred nearly $765,000 (combined) for benefit year 2014.  (*Id.* at ¶¶ 61-64).  The Ohio Turnpike and Infrastructure Commission ($92,043.00) and Warren County ($94,710.00) also have contributed sums for benefit year 2014 under protest.  (*Id.* at ¶¶ 65, 67-68).  And although no other state agencies or local governments joined this suit, "Plaintiffs are informed and believe that Defendants have proceeded to collect other transitional reinsurance tax 'contributions' from other entities of the government of the State of Ohio" as well.  (*See id.* at ¶ 60).

The State of Ohio and the other six plaintiffs now seek to recoup these monies as an allegedly unlawful application of the Transitional Reinsurance Program to state governments and their instrumentalities.  (*Id.* at ¶ 100).  The State filed suit on January 26, 2015, and amended its complaint on February 23, 2015, to add the Ohio Turnpike and Infrastructure Commission as a plaintiff.  (*Id.* at ¶ 21).  The State asks that this Court: (1) enter judgment in its favor; (2) require the federal government to refund each plaintiff the full amount collected under the Transitional Reinsurance Program; (3) require the federal government to set aside any regulations, directives, or instructions purporting to apply the program against state or local governments; and (4) enjoin the federal government from collecting any such funds from state or local governments in the future.  (*Id.* at ¶ 100).

Under the parties' joint proposed scheduling order, which the Court adopted to govern the case (*see* ECF #16), this matter comes before the Court on the federal government's Motion to Dismiss (ECF #17) and the State's Motion for Summary Judgment (ECF #18).  Both sides agree that the case presents purely legal issues and therefore have agreed to forego discovery. (*See* Joint Proposed Scheduling Order, ECF #15, PageID 82).

## II.  STANDARD OF REVIEW

The federal government moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Under these rules, plaintiffs bear the burden of establishing that the Court "has jurisdiction over [their] claim[s]" and that the complaint "contains sufficient factual matter to state a claim for relief that is plausible on its face."  *See Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014) (citations omitted).  A claim bears facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where, as here, the defendant facially attacks the court's subject-matter jurisdiction, "a trial court takes the allegations in the complaint as true," just as the court would "under [a] 12(b)(6) motion[] to dismiss."  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

The State moved for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proof on both points.  *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001).  In determining whether this standard is met, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013).

# III. ANALYSIS

The State of Ohio's latest Affordable Care Act challenge hinges on the answers to three questions: (1) whether this Court may entertain the State's claims; (2) if so, whether Congress intended the Transitional Reinsurance Program to apply to state and local governments that offer qualifying group health plans; and (3) provided Congress intended as much, whether application of the Transitional Reinsurance Program to state and local governments nevertheless violates the United States Constitution.  As explained below, the answers to these questions are "yes," "yes," and "no," respectively.  Accordingly, the Court must **GRANT** the federal government's Motion to Dismiss and **DENY** the State's Motion for Summary Judgment.

## A.  The Court May Entertain the State's Statutory Claims.

The federal government briefly challenges the Court's power to entertain the State's *statutory* claims, which are contained in Counts One and Two of the Amended Complaint.  (*See* Defs.' Mot. to Dismiss, ECF #17, PageID 98-99).  As explained below, the federal government's jurisdictional and other threshold challenges lack merit.  This Court may adjudicate the case in its entirety.

### 1.  Binding Precedent Establishes Jurisdiction Over the State's Tax-Refund Claim.

In Count One, the State argues that the federal government must remit monies paid under the Transitional Reinsurance Program as an illegally or erroneously assessed or collected tax.  (Pls.' Am. Compl., ECF #13, ¶¶ 78-81).  The State invokes this Court's jurisdiction under 28 U.S.C. § 1346(a)(1), which provides original, concurrent jurisdiction in the district courts and the United States Court of Federal Claims for "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected."  Essentially, the State seeks a tax refund.

The federal government argues that the contributions imposed under the Transitional Reinsurance Program do not constitute an "internal-revenue tax," and thus, do not fall under the jurisdictional grant from 28 U.S.C. § 1346(a)(1).  The federal government cites a recent case from the Tenth Circuit, where that court held that a "coal reclamation fee" assessed by the Department of the Interior did not constitute an "internal-revenue tax" within the meaning of § 1346(a)(1), thus depriving the district court of subject-matter jurisdiction.  *Wyodak Res. Dev. Corp. v. United States*, 637 F.3d 1127, 1129 (10th Cir. 2011) (holding that plaintiff's claim properly belonged "only in the Court of Federal claims under 28 U.S.C. § 1491").

The Sixth Circuit, however, takes a "broader view" of the term "internal-revenue tax," at least as that term appears in 28 U.S.C. § 1346(a)(1).  *See Horizon Coal Corp. v. United States*, 43 F.3d 234, 239 (6th Cir. 1994) (per curiam).  Under this Circuit's binding precedent, that term "refer[s] not [just] to [revenue raised under] the Internal Revenue Code, but [also] to [all] revenue generated within the boundaries of the United States, as opposed to 'external' revenue, which is derived from foreign sources through means such as import and custom duties."  *Id.* Thus, the very same coal reclamation fees that do *not* support jurisdiction in the district courts of the Tenth Circuit plainly *do* support jurisdiction in the district courts of this Circuit.  *Id.*

To its credit, the federal government acknowledges *Horizon Coal*, and merely raises this jurisdictional issue to preserve it on appeal.  (Defs.' Mot. to Dismiss, ECF #17, PageID 98 ("Defendants acknowledge that the Sixth Circuit has construed the term 'internal-revenue tax' to encompass all 'revenue generated within the boundaries of the United States,' . . . but respectfully preserve the argument that *Horizon Coal* was wrongly decided.  *See Wyodak*, 637 F.3d at 1131 (criticizing *Horizon Coal*).")).  To the extent the federal government seeks to preserve this issue on appeal, it has done so.

11

Nevertheless, unless and until the Sixth Circuit applies a different gloss to the term "internal-revenue tax" from 28 U.S.C. § 1346(a)(1), this Court remains bound by *Horizon Coal*, which provides jurisdiction to adjudicate Count One from the State's Amended Complaint.

### 2. The Court May Hear the State's Administrative-Procedures-Act Claim.

In Count Two, the State argues that the federal government's application of the Transitional Reinsurance Program to state and local governments constitutes an arbitrary and capricious agency action that must be set aside under the Administrative Procedures Act ("APA"). (Pls.' Am. Compl., ECF #13, ¶¶ 82-90). The State invokes this Court's power under 5 U.S.C. § 704, which authorizes judicial review for "final agency action[s] for which there is no other adequate remedy in a court." *See Bangura v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006) ("To state a claim for relief under the APA, a plaintiff must allege that his or her injury stems from a final agency action for which there is no other adequate remedy in court.").

The federal government argues, however, that the State lacks a cause of action under the APA because the State has not identified a specific "final agency action" that it challenges. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); *see also Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 n.4 (6th Cir. 2014) ("If there was no final agency action . . . there is no doubt that appellant would lack a cause of action under the APA." (quotation omitted)). To be clear, the final agency action requirement from 5 U.S.C. § 704 is not jurisdictional in the traditional sense but, rather, goes to whether the State can make out a claim under the APA. *Jama*, 760 F.3d at 494 n.4. Nevertheless, because both parties have briefed this point as a "threshold" issue, the Court addresses it at the outset of this Opinion before proceeding in earnest to the State's statutory and constitutional arguments.

12

The federal government's assertion that HHS has not taken a "final agency action" seems too clever by half. In short, the federal government contends that any payments the State made were "voluntary" and not as a result of a final agency action from which "rights or obligations have been determined, or from which legal consequences will flow." (Defs.' Mot. to Dismiss, ECF #17, PageID 99 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *see also* Defs.' Reply Br., ECF #21, PageID 197-98 ("Plaintiffs . . . apparently consulted the statute, determined that they were required to make the transitional reinsurance contributions, and then complied without prompting.")). But the federal government nowhere suggests that HHS is in the process of returning these "voluntary" contributions, despite a demand letter from the State of Ohio seeking such a return—not to mention this lawsuit. (*See* Pls.' Am. Compl., ECF #13, ¶¶ 53-56).

As a *practical* matter, the federal government cannot have it both ways. If the State's payments were "voluntary" but do not accord with HHS's final position, then HHS should remit the money.[3] If, however, HHS intends to keep the money under its view of the Transitional Reinsurance Program's applicability, then such a decision would be tantamount to the "consummation of the agency's decision-making process . . . . by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (quotations omitted) (contrasting a "tentative recommendation" from "a final and binding determination"); *see also Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 638 (6th Cir. 2004) ("The finality inquiry, we are told, is a 'flexible' and 'pragmatic' one." (quotation omitted)); *cf. Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (holding that agency's settled position, upon which it will insist that state and local authorities comply with its understanding, is reviewable under the APA).

---

[3] There is no dispute that the federal government electronically took control of the State's money. The federal government merely contends that it took control of the money without a final agency action. (*See* Defs.' Reply Br., ECF #21, PageID 198-99 & n.3).

The Court finds it telling that state and local government employers across the country believe they too must make contributions under the Transitional Reinsurance Program rather than await further guidance or agency action from HHS.  *See, e.g.*, *Information Regarding the Affordable Care Act for Employers Participating in HealthChoice as of November 2014*, Oklahoma's Official Web Site (Nov. 18, 2014), https://www.ok.gov/sib/Coordinators/Insurance_ Coordinator/ACA_Info_for_Employers.html (noting that Oklahoma's group health plan for state employees "is responsible for reporting and paying the Transitional Reinsurance Fee for all persons covered by [the plan]"); Heather Kerrigan, *Public Employers Seek to Soften Impact of Obamacare Fees and Taxes*, Governing Magazine (Sept. 11, 2013), http://www.governing.com/ blogs/fedwatch/gov-obamacare-cadillac-tax-reinsurance-fee.html (explaining that the Affordable Care Act's "transitional reinsurance fee will require state and local government employers to pay $63 per covered individual each year" and noting the steps that McHenry County, Illinois, was taking to pay its $160,000 "transitional reinsurance fee").[4]

And, as a *legal* matter, the Court finds that HHS has rendered a "final agency action" through its notice-and-comment rulemaking.  *See Appalachian Power*, 208 F.3d at 1020-21 & n.12 (noting that notice-and-comment rulemaking published in the Federal Register constitutes final agency action for APA review); *Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d 1339, 1361 (6th Cir. 1991) (holding that "the final, reviewable agency action was taken" when appropriate administrator "signed the final rulemaking document designated [in the Federal Register]").

---

[4] Experts from the public and private sectors of the regulated community agree.  *See, e.g.*, Government Finance Officers Association, *Complying with the Affordable Care Act*, 3 (Feb. 2014), http://www.gfoa.org/sites/default/files/CORBA_COMPLYING_WITH_THE_AFFORDABLE_CARE.pdf (explaining that sponsors of governmental healthcare plans "will be responsible for paying the costs associated with the Transitional Reinsurance Fee"); Willis North America, *Alert: Health Care Reform Bill: HHS Issues Additional Guidance on Transitional Reinsurance Program*, 3 (Jan. 2013), http://www.willis.com/documents/publications/Services/Employee_Benefits/Alerts_2013/HCPAlert_Janua ry2013_v3.pdf ("Neither the statute nor the regulations provide exceptions for governmental or church plans that are self-insured.").

In HHS's (first) final rule governing the Transitional Reinsurance Program, the agency established that "[a] contributing entity must [generally] make reinsurance contributions on behalf of its group health plans and health insurance coverage."  *See* Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors, and Risk Adjustment (Final Rule), 77 Fed. Reg. 17,220, 17,250 (Mar. 23, 2012) (to be codified at 45 C.F.R. § 153.400(a)(1)).  In the preamble to that rule, HHS explained that it was "adding paragraph (a)(1), which clarifies that *all* contributing entities must make reinsurance contributions on behalf of *all* group health plans and health insurance coverage they represent . . . . *For example, contributing entities are required to make reinsurance contributions on behalf of . . . State and local government employee plans . . . .*"  *Id.* at 17,235 (emphasis added).

HHS revisited the matter on December 7, 2012.  *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014 (Proposed Rule), 77 Fed. Reg. 73,118, 73,207 (Dec. 7, 2012) (to be codified at 45 C.F.R. § 153.400(a)(1)).  There, HHS proposed several exceptions to the contribution requirements described above, including an exception for "health insurance coverage . . . not considered to be part of an issuer's commercial book of business."  *Id.*  In the preamble to the proposed rule, HHS explained that, although "the Affordable Care Act refers to a 'commercial book of business,'" the agency was interpreting that phrase broadly, "to refer to [most] large and small employer group policies."  *Id.* at 73,153. HHS then noted, "while products offered by an issuer under Medicare Part C or D would be part of a 'governmental' book of business, not a commercial book of business," plans or coverage "*offered by . . . a State government . . . to employees (or retirees or dependents) because of a current or former employment relationship would be part of a commercial book of business*," and thus, subject to the reinsurance contribution.  *Id.* (emphasis added).

15

When HHS finalized this proposed rule governing contributing entities and exclusions, the department confirmed that healthcare plans and coverage offered to state employees were subject to reinsurance contributions.  *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014 (Final Rule), 78 Fed. Reg. 15,410, 15,528 through 15,529 (Mar. 11, 2013) (to be codified at 45 C.F.R. § 153.400(a)(1)-(2)) (providing thirteen exceptions to the reinsurance program contribution, but not mentioning plans offered by state or local governments).  In the preamble to that rule, HHS explained as follows:

> Section 1341(b)(3)(B)(i) of the Affordable Care Act refers to a "commercial book of business," which we proposed to interpret to refer to large and small group health insurance policies . . . . [A] plan or coverage offered by the Federal government, a State government, or a Tribe to employees . . . because of a current or former employment relationship would be part of a commercial book of business.  We are finalizing the provisions as proposed.

> *Comment:* One commenter agreed that coverage offered to Federal, State, or Tribal employees should be subject to reinsurance contributions, and that this coverage would be part of an issuer's commercial book of business.  Another commenter stated that since Federal and State employee plans make up a significant share of the market's large group enrollment, these plans should be included . . . for purposes of the reinsurance contribution.

> *Response:* For reinsurance purposes, we agree that insured coverage offered to Federal, State, or Tribal employees is part of an issuer's commercial book of business.  As discussed in the preamble to the proposed rule, we interpret "commercial book of business" to refer to insured large and small group policies and individual market policies.

*Id.* at 15,457; *see also* American Benefits Council, *Summary: HHS Releases New Proposed Regulations Regarding Transitional Reinsurance Program*, 6 (Dec. 12, 2012), http://www.americanbenefitscouncil.org/getpub.cfm?path=documents2012/hcr_trp-regs_summary-cm121212.pdf ("Per the preamble to the Final Regulations, contributing entities must make reinsurance contributions on behalf of plans in the Federal Employees Health Benefits Program, state and local government employee plans, and grandfathered health plans.").

This final rule, signed by HHS Secretary Kathleen Sebelius on February 17, 2013, and codified at 45 C.F.R. § 153.400(a)(1)-(2), constitutes a "final, reviewable agency action" under the APA.  *See Navistar Int'l Transp.*, 941 F.2d at 1361.

In sum, this Court has jurisdiction to hear the State's tax refund claim from Count One under 28 U.S.C. § 1346(a)(1), as interpreted by *Horizon Coal*.  Moreover, the State has made out a cause of action for Count Two under the Administrative Procedures Act because HHS has taken a final agency action, thus permitting judicial review.

**B.  Congress Intended the Transitional Reinsurance Program to Apply to State and Local Governments that Offer Qualifying Group Health Plans.**

Having the power to *hear* the State's statutory claims does not mean that the Court agrees with them.  Far from it.  Instead, the Court finds that Congress intended the Transitional Reinsurance Program to apply to state and local government employers in the same manner that the program applies to private-sector employers.  The text, structure, and purpose of the Affordable Care Act and related statutes compel this result.

The central question in this case is whether Congress intended for state and local government employers to make transitional reinsurance contributions under 42 U.S.C. § 18061. In answering that question, the Court looks first to the statutory language that Congress employed: "If the statutory language is plain, [the Court] must enforce it according to its terms." *King*, 135 S. Ct. at 2489.  Yet "oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'"  *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)).  As such, "when deciding whether the language is plain, [the Court] must read the words in their context and with a view to their place in the overall statutory scheme."  *Id.* (quotation omitted).  The Court's duty, "after all, is to construe statutes, not isolated provisions."  *Id.* (quotation omitted).

17

1.  "Non-Federal Governmental Plans" Offering Qualifying Medical Care Constitute a Subset of "Group Health Plans" Under the Public Health Service Act, Which Provides the Operative Definition for this Dispute.

As noted, the ACA requires reinsurance contributions from two different contributing entities—"health insurance issuers" and "group health plans."  *See* 42 U.S.C. § 18061(b)(1)(A).[5] Section 18061 does not define the terms "health insurance issuers" or "group health plans."  Nor, for that matter, does the ACA itself define those terms.  Instead, the ACA provides that the definitions from the Public Health Service Act ("PHSA"), which the ACA substantially amended, apply to Title I of the ACA unless otherwise indicated.  *See* 42 U.S.C. § 18111 ("Unless specifically provided for otherwise, the definitions contained in [Title 42] section 300gg-91 . . . shall apply with respect to [Title I of the ACA].").

The PHSA, in turn, defines "health insurance issuer" to mean "an insurance company, insurance service, or insurance organization . . . which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance." 42 U.S.C. § 300gg-91(b)(2).  All parties to this suit agree that the State of Ohio and its political subdivisions do *not* qualify as contributing entities under the "health insurance issuer" prong.

The PHSA elsewhere defines "group health plan" to mean "an employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income Security Act of 1974 [29 U.S.C.A. § 1002(1)]) to the extent that the plan provides medical care . . . to employees or their dependents . . . directly or through insurance, reimbursement, or otherwise."  *Id.* § 300-gg-91(a)(1).  The question, then, is whether the State's employer-sponsored healthcare plans qualify as "group health plans" within the meaning of the PHSA.

_____

[5] Although § 18061(b)(1)(A) states that "third party administrators[,] on behalf of group health plans, are required to make payments," HHS has interpreted this provision to mean that group health plans themselves are liable for the contributions, "although [the plans] may elect to use a third-party administrator . . . for transfer of the reinsurance contributions."  45 C.F.R. § 153.20.  This interpretation makes inherent sense given the simple fee-shifting that would occur were the rule otherwise.

The answer to that question is "yes," and the reason is straightforward: "non-Federal governmental plans," which the PHSA defines separately, constitute a subset of "group health plans," thereby ensuring that the State's healthcare plans qualify as "group health plans" under the PHSA and, as a result, with respect to the Transitional Reinsurance Program as well.

Under 42 U.S.C. § 300gg-91(d)(8)(c), the term "non-Federal governmental plan" means "a governmental plan that is not a Federal governmental plan." Accordingly, under the PHSA's cross-referenced definition, "non-Federal Governmental plan" means "a plan established or maintained for its employees . . . by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." *See id.* § 300gg-91(d)(8)(a) (referring, in turn, to 29 U.S.C. § 1002(32)). Congress plainly understands the term "group health plan" to encompass "non-Federal governmental plans" (including state and local governmental health plans) under the PHSA, and thus, the ACA. This understanding manifests itself in the text, structure, and purpose of the relevant statutes.

### a.  *"Non-Federal Governmental Plans" Constitute a Subset of "Group Health Plans" Because the PHSA Permits Non-Federal Governmental Plans to Exempt Themselves from Several Requirements that Otherwise Would Apply to the Broader Set of Group Health Plans.*

Congress first demonstrated its understanding that non-Federal governmental plans constitute a subset of group health plans when it enabled some of these governmental health plans to opt out of several requirements that otherwise would apply to the broader set of group health plans. *See* 42 U.S.C. § 300gg-21(a)(2)(A). Section 300gg-21(a), aptly entitled "Limitation on application of provisions relating to group health plans," permits self-insured non-Federal governmental plans to exempt themselves from certain healthcare requirements when "the plan sponsor of a nonfederal governmental plan which is a group health plan to which the provisions of subparts 1 and 2 otherwise apply makes an election." *Id.* § 300gg-21(a)(2)(A).

19

This opt-out provision, which permits self-insured non-Federal governmental plans to exempt themselves from requirements that otherwise would apply to "group health plans" under the PHSA (namely, subparts 1 and 2 of 42 U.S.C. Chapter 6A, Subchapter XXV), would be entirely superfluous if state and local governmental health plans were not group health plans under the PHSA in the first instance.  The Court is reluctant to render this opt-out provision superfluous, and the State has not explained satisfactorily how its reading of the ACA and the PHSA would avoid such a result.  *See Ford Motor Co. v. United States*, 768 F.3d 580, 587 (6th Cir. 2014) ("We must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous." (quotation omitted)).

### b.  *"Non-Federal Governmental Plans" Constitute a Subset of "Group Health Plans" Because Any Other Interpretation Would Render Many of the ACA's Statutory Revisions Meaningless.*

By enacting the ACA, Congress reinforced its understanding that non-Federal governmental plans (*i.e.*, state and local governmental health plans) constitute a subset of group health plans under both the PHSA and the ACA.  Indeed, Congress took care when enacting the ACA to restructure the provisions described above by which self-insured non-Federal governmental plans may opt out from certain healthcare coverage requirements. These statutory revisions would be meaningless were the Court to interpret the statutes as the State desires—to exclude non-Federal governmental plans from the broader category of "group health plans."

Prior to enactment of the ACA, self-insured non-Federal governmental plans could opt out of all five statutory sections contained in Title 42, Chapter 6A, Subchapter XXV, Part A, subparts 1 and 2 of the United States Code.  The relevant subparts formerly appeared in the United States Code as follows:

**SUBCHAPTER XXV—REQUIREMENTS RELATING TO HEALTH INSURANCE COVERAGE**

PART A—GROUP MARKET REFORMS

SUBPART 1—PORTABILITY, ACCESS, AND RENEWABILITY REQUIREMENTS

| 300gg. | Increased portability through limitation on preexisting condition exclusions. |
|---|---|
| 300gg-1. | Prohibiting discrimination against individual participants and beneficiaries based on health status. |

SUBPART 2—OTHER REQUIREMENTS

| 300gg-4. | Standards relating to benefits for mothers and newborns. |
|---|---|
| 300gg-5. | Parity in mental health and substance use disorder benefits. |
| 300gg-6. | Required coverage for reconstructive surgery following mastectomies. |

*See* 42 U.S.C., Chapter 6A, Subchapter XXV (2006 edition).

Because 42 U.S.C. § 300gg-21(a)(2)(A) permits self-insured non-Federal governmental plans to exempt themselves from "the provisions of subparts 1 and 2," the consequence was that, prior to the ACA, such plans could exempt themselves from *all* of the requirements listed above. In other words, self-funded state and local governmental health plans could opt out of limitations on preexisting condition exclusion periods, requirements for special enrollment periods, and prohibitions against discriminating based on a participant's health status, among other requirements. *See* Steve Larsen, *Amendments to the HIPAA Opt-Out Provision Made by the Affordable Care Act*, Dep't of Health & Human Servs., Office of Consumer Info. & Ins. Oversight, 1 (Sept. 21, 2010), https://www.cms.gov/CCIIO/Resources/Files/Downloads/opt-out-memo.pdf [hereinafter "ACA Opt-Out Memo"].

21

Congress changed all that by enacting the ACA.  Although the ACA left subpart 2 in place, it removed subpart 1 and created two new subparts—subparts I and II.  *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1001, 124 Stat. 119, 130-31 (2010) (creating subpart II); *id.* § 1201, 124 Stat. at 154 (striking subpart 1 and creating subpart I).  In so doing, Congress moved some of the provisions that had been in subpart 1 into the new subpart I, including the prohibition on discrimination in coverage and pricing based on an individual's health status.  *See* 42 U.S.C. § 300gg-4.  Congress also placed many of the ACA's signature reforms in the newly created subpart II, including: (1) the prohibition on lifetime or annual coverage limits; (2) required coverage of preventive health services; and (3) the extension of dependent coverage until age twenty-six.  *See id.* §§ 300gg-11, 300gg-13, and 300gg-14; *see also* ACA Opt-Out Memo at 1 ("The Affordable Care Act made a number of changes, with the result that sponsors of self-funded, nonfederal governmental plans can no longer opt out of as many requirements . . . .").  The ACA also amended the scope of the opt-out provision by categorically barring the ability to opt out of subparts I and II.  42 U.S.C. § 300gg-21(a)(2)(E).

If Congress believed (as the State argues) that non-Federal governmental plans are not "group health plans" under the PHSA, then the careful statutory revisions just described (including the decision to create two new subparts, move provisions from old subparts to new ones, and amend the scope of the opt-out provision) would be meaningless.  The only explanation for Congress's actions is that it intended to limit the provisions from which non-Federal governmental plans could opt-out—a task that would be pointless if such plans were never "group health plans" subject to the PHSA in the first instance.  Here again, the Court must construe non-Federal governmental plans as a subset of group health plans to avoid rendering Congress's actions meaningless.  *See United States v. Deen*, 706 F.3d 760, 755 (6th Cir. 2013).

*c.  "Non-Federal Governmental Plans" Constitute a Subset of "Group Health Plans" Because Any Other Interpretation Yields a Null Set with Respect to the PHSA's Enforcement Provisions.*

In addition to rendering the opt-out provision from 42 U.S.C. § 300gg-21(a)(2)(A) superfluous, and Congress's efforts to narrowly tailor that provision meaningless, the State's statutory argument ignores another indication that non-Federal governmental plans constitute a subset of group health plans.  As the federal government correctly notes, the PHSA enforcement section, which includes the ability to levy fines for ACA violations, generally vests primary enforcement authority in the states.  *See* 42 U.S.C. § 300gg-22(a)(1).  But this enforcement provision grants the *federal* government primary enforcement authority with respect to "group health plans that are non-Federal governmental plans."  *Id.* § 300gg-22(b)(1)(B); *see also id.* § 300gg-22(b)(2)(B)(ii) (referring to liability for "a group health plan that is a non-Federal governmental plan").  If the State's interpretation were correct, in that a plan offered by a state or local governmental employer is never a "group health plan," then the statute's reference to "group health plans that are non-Federal governmental plans" yields a null set.  Put differently, the State's preferred statutory interpretation leads to unintelligible and meaningless results with respect to one of the ACA's primary enforcement mechanisms.  That cannot be right.  *See Fed. Express Corp. v. U.S. Postal Serv.*, 151 F.3d 536, 542 (6th Cir. 1998) ("A statute should be construed to accord meaning and effect to each of its provisions.").

*d.  "Non-Federal Governmental Plans" Constitute a Subset of "Group Health Plans" Because Any Other Interpretation Would Exempt State and Local Governmental Plans From the Most Significant Reforms Contained in the ACA.*

Finally, a fair reading of the PHSA, as amended by the ACA, confirms that non-Federal Governmental Plans constitute a subset of group health plans because any other interpretation would exempt state and local governmental health plans from the most significant reforms enacted in the ACA.

23

For example, if the State were correct in its view that such plans do not qualify as "group health plans" for purposes of the Transitional Reinsurance Program then, by implication, state and local governmental health plans would be exempt from—among others—the following key provisions of the PHSA, as amended by the ACA:

- 42 U.S.C. § 300gg-3, which bars a "group health plan" from imposing preesixting condition exclusions;

- 42 U.S.C. § 300gg-4, which bars a "group health plan" from limiting eligibility on the basis of health status related factors;

- 42 U.S.C. § 300gg-6(b), which requires a "group health plan" to ensure that annual cost-sharing remains limited;

- 42 U.S.C. § 300gg-7, which prohibits a "group health plan" from imposing any defined waiting periods in excess of 90 days;

- 42 U.S.C. § 300gg-11, which bars a "group health plan" from establishing lifetime or annual dollar limits on healthcare benefits;

- 42 U.S.C. § 300gg-12, which generally bars a "group health plan" from rescinding coverage once issued;

- 42 U.S.C. § 300gg-13, which requires a "group health plan" to cover or provide various preventive health services with no cost-sharing; and

- 42 U.S.C. § 300gg-14, which requires a "group health plan" that offers dependent coverage to make such coverage available until dependents reach the age of twenty-six;

Put differently, if the State's health plans do not qualify as "group health plans," then they would be free from the overall regulatory structure imposed by the PHSA as amended by the ACA. Under this interpretation, those plans could deny employees coverage based on preexisting conditions; cap benefits on an annual or lifetime basis; terminate a participant's coverage at-will if he or she became too expensive; avoid paying for preventive care; and deny dependent coverage to participants' children before they reached age twenty-six (among other actions listed above and contained elsewhere in subparts I and II).

24

Surely Congress did not intend such a dramatic departure from the overall aim of the Affordable Care Act when it employed the same term—"group health plans"—in the Transitional Reinsurance Program.  *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quotation omitted)); *see also King*, 135 S. Ct. at 2492 (noting approvingly that courts "cannot interpret federal statutes to negate their own stated purposes" (quotation omitted)).[6]  After all, "[o]ne ordinarily assumes that identical words used in different parts of the same act are intended to have the same meaning." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014).

---

[6] The State erroneously contends that placement of these signature reforms in subparts I and II of 42 U.S.C. Chapter 6A, Subchapter XXV, Part A, demonstrates that Congress knew how to specify the *inclusion* of governmental plans when it wanted to do so.  The State's logic goes something like this: (1) Congress placed the ACA's signature reforms in subparts I and II; (2) Congress then made those reforms applicable to self-funded governmental plans by express language in the introductory paragraph of the "opt-out" provision, codified at 42 U.S.C. § 300gg-21(a)(1), which states that "[t]he requirements of subparts 1 and 2 shall apply" to non-Federal governmental plans, subject to the opt-out provision; but (3) Congress "did *not* use such inclusionary language when it came to the Transitional Reinsurance [contribution]." (*See* Pls.' Mot. for Summ. J., ECF #18, PageID 143-44).

This argument fails for several reasons.  *First*, the introductory language from § 300gg-21(a)(1) does *not* make the ACA's signature reforms, contained in subparts I and II, "applicable by express language" to non-Federal governmental plans, as the State contends.  Rather, the introductory language from § 300gg-21(a)(1) makes the "[t]he requirements of subparts *1 and 2*" (emphasis added) applicable to those plans, subject to the opt-out provision.  Subparts 1 and 2 differ from subparts I and II.  In fact, subpart 1 no longer exists due to an apparent renumbering error.  Thus, Congress must have presupposed that non-Federal governmental plans constitute a subset of group health plans under the PHSA if, as the State concedes, the ACA's signature coverage reforms apply to state and local governmental plans. *Second*, the State's inclusionary/exclusionary argument overlooks that the opt-out provision is expressly entitled "*Exclusion* of certain plans," 42 U.S.C. § 300gg-21 (emphasis added); provides for "*Limitation[s]* on application of provisions relating to group health plans," *id.* § 300gg-21(a) (emphasis added); mandates that subparts 1 and 2 apply to non-Federal governmental health plans subject *only* to the opt-out provision, *id.* § 300gg-21(a)(1)(A); and permits self-funded non-Federal governmental plans to exempt themselves from those requirements, *id.* § 300gg-21(a)(2)(A).  Rather than showing that Congress knew how to *include* non-Federal governmental plans when it wanted to, this language shows that Congress knew how to *exclude* such plans when Congress intended as much.  This exclusion makes sense only if Congress understood that non-Federal governmental plans fall under the broader set of "group health plans" in the first place.  The State's argument turns this straightforward reading of the opt-out provision on its head and overlooks that Congress *nowhere* excluded or provided an "opt-out" mechanism for governmental health plans facing transitional reinsurance contributions.  *See Fry v. United States*, 421 U.S. 542, 545-46 (1975) (holding that federal wage controls applied to state employees too).

To be sure, the presumption that the same term means the same thing throughout the same act does not always apply.  *See id.*  In fact, the Supreme Court recently hinted that the presumption of consistent usage may not apply with respect to a *different* phrase from the ACA—"established by the State"—because rigid adherence to the presumption may have cut against Congressional intent to provide tax credits to low- and moderate-income Americans.  *See King*, 135 S. Ct. at 2493 & n.3 (noting that "the presumption of consistent usage readily yields to context," but avoiding the issue "[b]ecause the other provisions cited by the dissent are not at issue here").  But in *this* case, the State offers no explanation (beyond a desire not to pay) for why Congress meant one thing with respect to "group health plans" when enacting the landmark healthcare reforms contained in 42 U.S.C. Chapter 6A, Subchapter XXV, Part A, Subparts I and II, or one of the ACA's primary enforcement mechanisms, 42 U.S.C. § 300gg-22, yet meant *another* thing with respect to funding the Transitional Reinsurance Program.  Accordingly, the Court will follow the presumption of consistent usage especially where, as here, Congress repeatedly demonstrated its understanding that non-Federal governmental health plans constitute a subset of "group health plans" under the PHSA and the ACA.

### *e.  The State's Arguments to the Contrary Lack Merit.*

Against this straightforward reading of the Affordable Care Act, the State points to several statutory phrases that it believes show that non-Federal governmental plans are *not* group health plans.  As explained below, the State's arguments lack merit.

*First*, the State points to I.R.C. § 4377(b)(1)(B), a provision of the Internal Revenue Code that states "governmental entities shall not be exempt from the fees" relating to the Patient Centered Outcomes Research Institute ("PCORI"), except as then provided.  *See* I.R.C. § 9511(e) (providing that funding for PCORI shall come from fees imposed under I.R.C. §§ 4375-4377);

*id.* § 4375 (establishing PCORI fees for certain "health insurance polic[ies]"); *id.* § 4376 (establishing PCORI fees for certain "self-insured health plan[s]"); *id.* § 4377 (providing special rules for PCORI fees).  The State contends that the language from § 4377(b)(1)(B) shows that Congress knew how to impose fees on state and local governments when that was its intent.

But the fees the State points to are imposed under the Internal Revenue Code, not the PHSA, and are imposed on "health insurance polic[ies]," *see* I.R.C. § 5375(a), and "health plan[s]," *id.* § 5376(a), not "group health plans."  As such, this provision sheds little light on the meaning of "group health plans" as that term appears in the PHSA.  If anything, resorting to the Internal Revenue Code favors the federal government's position.  Elsewhere, the Internal Revenue Code provides several definitions of "minimal essential [healthcare] coverage," which most individuals must obtain to avoid a tax penalty under the ACA.  *See* I.R.C. § 5000A(a), (f); *see also NFIB*, 132 S. Ct. at 2580 (describing the ACA's "individual mandate").  There, Congress provided that "minimal essential coverage" includes "[c]overage under an eligible employer-sponsored plan," which, in turn, means, "with respect to any employee, *a group health plan . . .* offered by an employer to the employee *which is . . . a governmental plan (within the meaning of section 2791(d)(8) of the Public Health Service Act)* [42 U.S.C. § 300gg-91(d)(8)]." I.R.C. § 5000A(f)(1)(B), (f)(2)(A) (emphasis added).  These provisions reinforce the notion that Congress understood governmental plans (including non-Federal governmental plans) to constitute a type of "group health plan" under the PHSA and the ACA.  After all, I.R.C. § 5000A(f)(2)(A) explicitly lists "a governmental plan" as a type of "group health plan."  And it makes no sense to interpret the ACA in a manner that simultaneously excludes non-Federal governmental plans from most of the ACA's landmark coverage reforms but then endorses those plans as "minimal essential coverage" for purposes of satisfying the individual mandate.

27

*Second*, the State points to 42 U.S.C. § 300bb-1, a provision from the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), which amended the PHSA by requiring "each group health plan that is maintained by any State" to offer a temporary extension of healthcare coverage that otherwise might be terminated upon certain qualifying events. *See* 42 U.S.C. § 300bb-1(a) (describing the requirements for COBRA "continuation coverage"). The State suggests that this provision, which includes the modifier "maintained by any State," shows that "Congress when it wanted to include governmental entities simply added explicit language doing just that." (Pls.' Mot. for Summ. J., ECF #18, PageID 145 (emphasis omitted)).

In truth, this provision speaks specifically to governmental plans because Congress placed COBRA's primary continuation coverage requirements for group health plans in the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1161-1169 (listing COBRA continuation-coverage amendments). And, as explained in some detail, *infra*, Section III.B.2., Congress excluded governmental plans from ERISA's substantive requirements, including the continuation-coverage requirements from §§ 1161-1169. *See id.* § 1003(b)(1). For that reason, it became necessary to include government-only language someplace else, thus explaining the "virtual mirror image" continuation-coverage requirements in both Title 29, Chapter 18 (ERISA) and Title 42, Chapter 6A (the PHSA). *See Williams v. New Castle Cnty.*, 970 F.2d 1260, 1264 (3d Cir. 1992) (explaining that COBRA amendments to the PHSA "fill this gap [from ERISA] by providing similar protection to beneficiaries losing coverage" under governmental plans). Thus, the modifying language from 42 U.S.C. § 300bb-1(a) shows only that ERISA excludes governmental plans from its substantive requirements, a point about which there is no disagreement; this language says nothing about whether non-Federal governmental plans constitute "group health plans" for purposes of the Transitional Reinsurance Program.

28

The State's reliance on the definitions section of the COBRA amendments fares no better.  *See* 42 U.S.C. § 300bb-8(1).  There, Congress defined the term "group health plan" (for purposes of the COBRA continuation-coverage amendments to the PHSA) to mean "a plan (including a self-insured plan) of, or contributed to by, an employer . . . or employee organization to provide health care" to current or past employees and their families.  *See id.* (cross-referencing the definition from I.R.C. § 5000(b)).  In the cross-referenced definition for "group health plan" from the Internal Revenue Code, Congress specified that "[f]or purposes of this section, the term 'employer' does not include a Federal or other governmental entity." I.R.C. § 5000(d).  The State latches onto this definition and says "Aha!": The modifying language "maintained by any State" from 42 U.S.C. § 300bb-1(a) shows that the term "group health plan," as used elsewhere throughout the PHSA, must *exclude* governmental plans.

Not so.  Whatever else this cross-referenced definition means for the excise tax imposed by I.R.C. § 5000, it remains apparent that the separate definition of "group health plan" found in the COBRA amendments must *include* governmental entities.  Otherwise, there could never be a "group health plan that is maintained by [a] State," as contemplated in 42 U.S.C. § 300bb-1(a). Under the State's interpretation, that phrase would become gibberish, sounding something like this: "each plan (including a self-insured plan) of, or contributed to by, an employer—*not including a Federal or other governmental entity*— . . . that is maintained by [a] State . . . by any political subdivision of such a State, or by any agency or instrumentality of such a State or political subdivision . . . ."  *See id.*; *id.* § 300bb-8(1); I.R.C. § 5000(b), (d).  The Court is unwilling to interpret these statutes that way.  Instead, the Court views Congress's treatment of "group health plans" in the definitions section of the COBRA amendments as consistent with its treatment of such plans elsewhere in the PHSA—*i.e.*, it too includes governmental entities.

*Third*, the State points to 42 U.S.C. § 1395w-132(c)(3), which defines the term "group health plan" for purposes of *one section* of the Medicare Modernization Act of 2003 ("MMA"). *See id.* § 1395w-132(c) (providing definitions "[f]or purposes of this section"). The State argues that because this definition includes *both* the definition of "group health plan" from 29 U.S.C. § 1167(1) *and* "Federal and State Governmental plans," Congress must have understood the term "group health plan" ordinarily to exclude such governmental plans in the PHSA. *See* 42 U.S.C. § 1395w-132(c)(3).

This argument lacks merit for two reasons. For starters, the statute that the State relies on does not fall under the PHSA. Instead, that statute falls under the Social Security Act, codified in Title 42, *Chapter 7*, and it limits its definitions to a single section therein. *Id.* Thus, whatever § 1395w-132(c)(3) might say about the MMA's definition of group health plan, it says very little about the PHSA's definition, contained separately at 42 U.S.C. § 300gg-91(a)(1). Moreover, the State again overlooks the interplay between the COBRA amendments to ERISA and ERISA's governmental plan exclusion. The MMA defines "group health plan" by cross-referencing the definition from the COBRA amendments to ERISA. *Id.* § 1395w-132(c)(3) (cross-referencing 29 U.S.C. § 1167(1)). As explained, ERISA excludes governmental plans from its substantive requirements. *See* 29 U.S.C. § 1003(b)(1). Thus, by pointing to ERISA's continuing-coverage definition of "group health plan" but then supplementing that definition to include governmental plans, the MMA simply suggests that Congress wanted to ensure that those plans did not fall through the cracks in other statutes (like the MMA) that derive their meaning from ERISA's *substantive* requirements. *Cf. Williams*, 970 F.2d at 1264. There is no such worry with respect to the Transitional Reinsurance Program, because that statute does not define "group health plan" in relation to any of ERISA's substantive requirements, such as the COBRA amendments.

*Fourth*, the State points to 42 U.S.C. § 300gg-41(b)(1), which describes a person "whose most recent creditable coverage was under a group health plan, governmental plan, or church plan" when discussing who qualifies as an "eligible individual" for one of the PHSA's guaranteed availability provisions. *See* 42 U.S.C. § 300gg-41(a)(1), (b)(1) ("In this part, the term 'eligible individual' means an individual— . . . for whom . . . the aggregate of the periods of creditable coverage (as defined in [42 U.S.C. § 300gg-3(c)]) is 18 or more months and . . . whose most recent prior creditable coverage was under a group health plan, governmental plan, or church plan (or health insurance coverage offered in connection with any such plan) . . . ."); *see also id.* § 300gg-3(c)(1)(A), (I) (defining "creditable coverage" and listing "[a] group health plan" and "[a] public health plan (as defined in regulations)" separately). The State argues that if the phrase "group health plan" necessarily subsumes governmental plans, then the definitions from §§ 300gg-41(b)(1) and 300gg-3(c)(1) would be redundant.

On its face, this appears to be the State's strongest argument. On closer inspection, however, this language at best shows that in one provision of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which amended the PHSA, the drafters were overly cautious. *See* HIPAA, Pub. L. No. 104-191, § 111(a), 110 Stat. 1936, 1978-1979 (1996) (codified at 42 U.S.C. § 300gg-41(b)(1)) (adding definition of "eligible individual" with reference to recent prior "creditable coverage" (as defined in [42 U.S.C. § 300gg-3(c)(1)]) under "a group health plan, governmental plan, or church plan"). Indeed, while the cross-referenced definition from 42 U.S.C. § 300gg-3(c)(1) lists "group health plan[s]" and "public health plan[s]" separately, that section nowhere mentions "church plans"—thus indicating that "church plans" fall under the broader category of "group health plan[s]" if the definition of "eligible individual" from § 300gg-41(b)(1) is to be given its full meaning. *See* 42 U.S.C. § 300gg-3(c)(1).

31

The regulations enacted under § 300gg-3(c)(1) (defining "creditable coverage") likewise demonstrate that several of the enumerated examples subsume one another to some extent. For example, the regulation defines "public health plan" to include "*any* plan established or maintained by . . . the U.S. government . . . or any political subdivision of . . . the U.S. government."  45 C.F.R. § 146.113(a)(1)(ix) (emphasis added).  Yet in the same section, the regulation provides that other examples of "creditable coverage" include coverage provided under "Title 10 U.S.C. Chapter 55," which pertains to "medical and dental care for members and certain former members of the uniformed services, and their dependents," as well as plans offered under "the Federal Employees Health Benefits Program."  *Id.* § 146.113(a)(1)(v), (vii). Certainly those types of coverage fall under the broader heading of "[a] public health plan," at least as that term is defined in the regulation, because they constitute plans "established or maintained by . . . the U.S. government."  *See id.* § 146.113(a)(1)(ix).

At bottom, the Court simply cannot agree with the State that the provisions of 42 U.S.C. §§ 300gg-3(c)(1) and 300gg-41(b)(1) are "parallel" in every instance, or that any purported "juxtaposition" of terms contained therein undercuts the fact that when Congress passed the ACA in 2010, it understood that the term "group health plans" encompassed governmental plans.  Otherwise, the term "church plans" would be written out of § 300gg-41(b)(1) as qualifying "creditable coverage."  More problematically, the restriction of the PHSA requirements from which self-insured non-Federal governmental plans could exempt themselves, or the care that Congress demonstrated when revising those restrictions, would make no sense.  Instead, the better reading is that when Congress enacted 42 U.S.C. §§ 300gg-3(c)(1) and 300gg-41(b)(1) in 1996, the drafters were overly cautious by listing "group health plan" and "governmental plans" or "public health plans" separately.

*Finally*, the State points to a 2014 Congressional Budget Office ("CBO") document indicating that the Transitional Reinsurance Program contribution falls on "most private insurance plans." *See* Congressional Budget Office, *Updated Estimates of the Effects of the Insurance Coverage Provisions of the Affordable Care Act*, 7 (April 2014), https://www.cbo.gov/sites/default/files/45231-ACA_Estimates.pdf. The CBO report, however, addresses the Transitional Reinsurance Program only in passing, and even then—with an eye toward the program's revenue estimates and effects on insurance premiums—not on whether governmental plans qualify as "group health plans." In fact, the CBO report never states that the reinsurance contribution does *not* also fall on non-Federal governmental plans. And in any event, the CBO does not and cannot authoritatively interpret federal statutes. *See Ameritech Corp. v. McCann*, 403 F.3d 908, 913 (7th Cir. 2005) (Easterbrook, J.) (holding that a provision from the Electronic Communications Privacy Act applied to the states, irrespective of CBO opinion to the contrary; "Although the Congressional Budget Office expressed an opinion that the 1986 law would not impose new costs on states, this view—on which Congress did not vote, and the President did not sign—cannot alter the meaning of enacted statutes.").

2.  "Governmental Plans" Constitute a Type of "Employee Welfare Benefit Plan" Under the Employee Retirement Income Security Act, the Definitions of Which the PHSA Incorporates.

As explained above, when Congress enacted the ACA, it did so with the understanding that state and local governmental health plans constitute a subset of "group health plans" as that term is used throughout the PHSA—thus subjecting those plans to the Transitional Reinsurance Program. This understanding likewise flows from the PHSA's cross-referenced definition to the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 42 U.S.C. § 300gg-91(a)(1) (defining the operative term "group health plan" with reference to ERISA's definition of "employee welfare benefit plan").

33

<u>*a.  "Governmental Plans" Constitute a Type of "Employee Welfare Benefit Plan" Because Any Other Interpretation Would Render ERISA's Governmental Plan Exclusion Superfluous.*</u>

Under ERISA, it remains equally true that the state and local governmental health plans at issue qualify as "employee welfare benefit plans."  Just like the PHSA, ERISA contains definitions for both the broader category of "employee welfare benefit plans" and a subset of that category, "governmental plans."  *See* 29 U.S.C. § 1002(1) ("The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . ."); *id.* § 1002(32) ("The term 'governmental plan' means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing.").  And, just like the PHSA, ERISA recognizes that governmental plans constitute a type of employee welfare benefit plan, as evidenced by ERISA's separate exclusion for such plans from many of the substantive requirements that otherwise would apply.  *See id.* § 1003(b)(1) ("The provisions of this subchapter shall not apply to any employee benefit plan if . . . such plan is a governmental plan (as defined in section 1002(32) of this title)."); *cf. Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (explaining that 29 U.S.C. § 1003(b)(1) "excludes application of the Act's provisions to governmental plans").

ERISA's definition of "employee welfare benefit fund" must be understood to include "governmental plans."  To read the statute otherwise would render the governmental plan exclusion from 29 U.S.C. § 1003(b)(1) largely meaningless.  In other words, if governmental plans do not qualify as employee welfare benefit plans in the first place, then no exclusion would be necessary.  Such an interpretation (which the State endorses) would "violate[] the interpretive canon that cautions against construing statutory language in a way that renders any of it superfluous."  *See United States v. Llanez-Garcia*, 735 F.3d 483, 498 (6th Cir. 2013).

34

A large body of case law interpreting the governmental plan exclusion confirms that "governmental plans" constitute a *type* of employee benefit plan, not a separate category. *See, e.g.*, *Gualandi v. Adams*, 385 F.3d 236, 242 (2d Cir. 2004) ("Title I of ERISA specifically excludes from its coverage any employee benefit plan that is a governmental plan."); *Shirley v. Maxicare Tex., Inc.*, 921 F.2d 565, 567 (5th Cir. 1991) ("Under 29 U.S.C. § 1003(b), however, ERISA shall not apply to any employee benefit plan if such plan is a governmental plan."); *Lovelace v. Prudential Ins. Co. of Am.*, 775 F. Supp. 228, 229 (S.D. Ohio 1991) ("ERISA regulates employee benefit plans, such as the [public school district] plan at issue . . . . The parties' dispute as to this Court's jurisdiction centers [instead] on whether the Wilmington plan is a 'governmental plan' within the meaning of ERISA and therefore is exempt . . . .").

For example, in *Weiner*, the Sixth Circuit examined whether it had subject-matter jurisdiction over an ERISA appeal involving the Portage County Benefit Plan and the City of Barberton Health Benefit Plan. *Weiner*, 108 F.3d at 88-89. There, the court agreed that these governmental plans qualified as "employee benefit plans" within the meaning of ERISA but nevertheless fell outside of the Act's coverage due to the governmental plan exclusion from 29 U.S.C. § 1003(b)(1). *See id.* at 89-90 & n.3 ("[A] plan may be an 'employee benefit plan' and thus fall within the scope of ERISA, but then be excluded from ERISA coverage because it is a governmental plan."). Likewise, in *Lovelace*, this Court held that a health insurance plan established by the Wilmington City Public School System qualified as an employee welfare benefit plan under ERISA but nevertheless fell within ERISA's governmental plan exclusion. *Lovelace*, 775 F. Supp. at 229-30 ("ERISA regulates employee benefit plans, *such as the plan at issue* . . . . [but] exempt[s] any plan established or maintained 'by the government of any State or political subdivision thereof' for its employees." (emphasis added)).

35

These findings and application of the governmental plan exclusion would be unnecessary if, as the State contends, governmental plans do not fall under the broader definition of "employee welfare benefit plan" in the first instance.  In fact, courts and litigants typically take for granted that governmental plans qualify as employee benefit plans within the meaning of ERISA—skipping instead to the more difficult question of whether the benefit plan in-question qualifies for exclusion under § 1003(b)(1).  *See, e.g.*, *Komanicky v. Teachers Ins. & Annuity Ass'n*, 230 F.3d 1358, 2000 WL 1290357, at *2 (6th Cir. 2000) (unpublished table decision) (holding that disability plan established by state university for benefit of employees qualified for governmental plan exclusion); *Eschleman v. UnitedHealth Grp., Inc.*, No. 2:12-cv-519, 2013 WL 4832066, at *3 (S.D. Ohio Sept. 10, 2013) ("Since [plaintiff] is an employee of the State of Ohio and her insurance plan was established and maintained by the State of Ohio, ERISA is not applicable."); *Robert v. Bd. of Cnty. Comm'rs of Brown Cnty., Kan.*, No. 08-2150-EFM, 2011 WL 836729, at *9 (D. Kan. Mar. 3, 2011) (holding that county government's healthcare plan qualified for governmental plan exclusion); *Kirkpatrick v. Merit Behavioral Care Corp.*, 70 F. Supp. 2d 443, 445-47 (D. Vt. 1999) (holding that healthcare plan established by the State of Vermont for eligible employees qualified for governmental plan exclusion); *Garvey v. Ruch Prudential HMO, Inc.*, No. 96 C 3791, 1996 WL 648720, at *1-4 (N.D. Ill. Nov. 4, 1996) (holding that "employee benefit plan" sponsored by "two participating employers"—Cook County and the Cook County Forest Preserve District—qualified for governmental plan exclusion).  This analytical leap to the governmental plan exclusion, which often involves more vexing questions over the establishment, maintenance, and composition of the relevant plan, would be wholly unnecessary if governmental plans offered by states, counties, state universities, and the like did not qualify as employee benefit plans in the first place.

Under *Weiner*, *Lovelace*, and a parade of other cases, the governmental healthcare plans offered by the State of Ohio and its instrumentalities and political subdivisions qualify as "employee welfare benefit plans" under ERISA.  Because the Affordable Care Act incorporated ERISA's definition of employee welfare benefit plans when defining the term "group health plans" (by way of 42 U.S.C. §§ 18111 and 300gg-91(a)(1)), those healthcare plans qualify as "group health plans" under the Transitional Reinsurance Program as well.

### b. The State's Unduly Narrow Interpretation of "Employee Welfare Benefit Plan" Lacks Merit.

Against this well-accepted understanding of how ERISA and its governmental plan exclusion do (and do not) operate, the State counters with an unduly narrow interpretation of "employee welfare benefit plan"—one that entirely excludes "governmental plans" offered by states, counties, state universities, and the like.  The State contends that, under ERISA, such "governmental plans" cannot qualify as "employee welfare benefit plans" due to the following chain of inferences: (1) "employee welfare benefit plans" require an "employer," *see* 29 U.S.C. § 1002(1); (2) ERISA defines the term "employer" to mean "any *person* acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan," *id.* § 1002(5) (emphasis added); (3) ERISA's definition of "person" lists "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization," but does not list state or local governments; (4) this omission precludes governmental plans offered by states and their political subdivisions from qualifying as employee welfare benefit plans per se; and (5) as a result, such plans do not qualify as "group health plans" for purposes of the Transitional Reinsurance Program either.  (Pls.' Mot. for Summ. J., ECF #18, PageID 141-42).  As explained below, the State's crabbed interpretation of "employee welfare benefit plan" lacks merit.

37

*First*, the Court need look no further than the definition of "governmental plan," which, by its own terms, expressly contemplates that "the government of any State or political subdivision thereof" can qualify as an employer. *See* 29 U.S.C. § 1002(32). There, Congress defined the term "governmental plan" to mean "a plan established or maintained *for its employees* by the Government of the United States, *by the government of any State or political subdivision thereof*, or by any agency or instrumentality of any of the foregoing." *Id.* (emphasis added). Can "employees" exist in the absence of an "employer"? Congress thinks not, as evidenced by its earlier definition of the term "employee" to mean "any individual employed by an employer." *Id.* § 1002(6). Common sense and ordinary usage dictate the same result. Therefore, § 1002(32), which defines "governmental plans" vis-à-vis "employees," certainly envisions state and local governments serving in the role of an "employer." As such, even under the State's recursive argument and dizzying resort to sub-definition after sub-definition from § 1002, "governmental plans" must constitute a type of "employee welfare benefit plan." *Simac v. Health Alliance Med. Plans, Inc.*, 961 F. Supp. 216, 218 (C.D. Ill. 1997) ("Simply put, an employee welfare benefit plan is a program set up by an employer to provide benefits . . . to its employees. Applying that definition to this case reveals that the State of Illinois established an employee welfare benefit plan when it mandated that all state employees receive basic health coverage."). This understanding explains why case after case excluding governmental plans from ERISA coverage does so under the governmental exclusion from 29 U.S.C. § 1003(b)(1), and not under ERISA's definition of "employee welfare benefit plan," *id.* § 1002(1), nor the definition of "employer," *id.* § 1002(5), or "person," *id.* § 1002(9). *See, e.g.*, *Weiner*, 108 F.3d at 89-90 & n.3 (county benefit plan); *Eschleman*, 2013 WL 4832066, at *2 (state benefit plan); *Lovelace*, 775 F. Supp. at 230 (school district benefit plan).

*Second*, even if the Court were to follow the State's argument jot-for-jot by focusing solely on the term "person" from § 1002(9), the State's argument still fails. Courts have found that ERISA's definition of "person" is not "exhaustive," but, rather, includes other un-enumerated entities where the statute elsewhere contemplates their inclusion. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 370-71 (4th Cir. 2014) ("That the provision does not expressly list 'committees' does not mean that committees cannot be 'persons who are fiduciaries' under ERISA."); *Veera v. Ambac Plan Admin. Order Comm.*, 769 F. Supp. 2d 223, 231 (S.D.N.Y. 2011) (same). *Tatum* and *Veera* both found that ERISA's definition of "person" must include plan committees as well (despite *not* being listed) because another statutory provision extends liability to "persons who are fiduciaries," and committees can serve as "fiduciaries." *See Tatum*, 761 F.3d at 371; *Veera*, 769 F. Supp. 2d at 231. Likewise, ERISA elsewhere contemplates that governmental plans can constitute a type of employee benefit plan in two different sections: (1) 29 U.S.C. § 1002(32), which defines "governmental plan" vis-à-vis the government's "employees," who in turn require "employers" under the statute, *see id.* § 1002(6); and (2) 29 U.S.C. § 1003(b)(1), which expressly provides for exclusion from liability for "governmental plans." Accordingly, as in *Tatum* and *Veera*, the term "person" must be interpreted broadly enough to give the rest of the statute meaning.[7]

---

[7] The State's reliance on *Pennsylvania Department of Public Welfare v. Quaker Medical Care & Survivors Plan*, 836 F. Supp. 314, 318 (W.D. Pa. 1993) seems misplaced. *Quaker Medical* held that a state agency could not qualify as a *beneficiary* under ERISA. *Id.* (citing 29 U.S.C. § 1002(8)). That case did not consider, let alone resolve, whether state and local governments qualify as "employers" under the statute, nor did it consider the broader (and more relevant) question of whether plans operated by state or local governments satisfy the definition of "employee welfare benefit plans." As explained, these distinctions matter, because ERISA provides textual and structural reasons to believe that state and local governments *do* qualify as "employers," *see* 29 U.S.C. § 1102(32) (defining "governmental plan" vis-à-vis the government's "employees," who in turn require an "employer" under the statute), and that governmental plans *do* satisfy the definition of employee welfare benefit plans so as to give meaning to the governmental plan exclusion, *see Lovelace*, 775 F. Supp. at 229 ("ERISA regulates employee benefit plans, *such as the plan at issue* . . . . [but] exempt[s] any plan established or maintained 'by the government of any State or political subdivision thereof' for its employees." (emphasis added)).

*Third*, the State's reliance on a single case interpreting the term "person" from the Securities Exchange Act of 1934 sheds little light on the matter. *See Brown v. City of Covington*, 805 F.2d 1266, 1269 (6th Cir. 1986) (holding that cities are not "persons" within the meaning of § 3(a)(9) of pre-1975 version of Securities Exchange Act of 1934, which defined "person" to mean "an individual, corporation, a partnership, an association, a joint-stock company, a business trust, or an unincorporated organization"). To state the obvious, what Congress meant when enacting landmark securities legislation during the height of the Great Depression explains little about what Congress meant when enacting pension-reform legislation in the mid-1970s (ERISA), and still less about Congress meant when enacting healthcare reform nearly seventy-five years later (ACA). (*Cf.* Pls.' Mot. for Summ. J., ECF #18, PageID 142 (acknowledging that ERISA definition of "employee welfare benefit plan" is "even another step removed and still higher a level of generality" than the term "group health plan" as used in the ACA)).

But more to the point, a recent decision from the Sixth Circuit has construed a nearly identical definition of the term "person" from the Fair Labor Standards Act ("FLSA")[8] to *include* local governments, implicitly rejecting the same argument the State now advances. *See Cunningham v. Gibson Cnty., Tenn.*, 108 F.3d 1376, 1997 WL 123750, at *2 (6th Cir. 1997) (unpublished table decision) ("[I]f defendants' argument that local governments are not persons within the meaning of § 215(a)(3) is accepted, the result is the exemption of local governments from even FLSA's most fundamental provisions. As this cannot be understood to have been the intent of Congress, the defendants' argument must fail."). *Cunningham* undercuts the State's misplaced attempt to rely on unrelated legislation to get around the plain meaning of ERISA.

---

[8] *Compare* 29 U.S.C. § 1002(9) (ERISA) ("The term 'person' means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."), *with* 29 U.S.C. § 203(a) (FLSA) ("'Person' means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."). The State offers no distinction between these two provisions.

40

The State tries to distinguish *Cunningham* by incorrectly suggesting that the decision turned on the FLSA's definition of "employer," which expressly includes a "public agency." While the FLSA does define "employer" to include a "public agency," 29 U.S.C. § 203(d), that definition played no role in *Cunningham*, where the relevant statute imposed liability upon any "person" who violates the FLSA, not any "employer." *Cunningham*, 1997 WL 123750, at *2 (citing 29 U.S.C. § 215(a)(3)).   And the Sixth Circuit reached its holding even though the FLSA's definition of "person," unlike the FLSA's definition of "employer," does not explicitly list local governments. *Compare* 29 U.S.C. § 203(a) (person), *with id.* § 203(d) (employer). This expansive reading of a nearly identical term from the FLSA suggests that "governmental plans" constitute a type of "employee welfare benefit plans" under ERISA and, thus, under the ACA as well.  At the very least, *Cunningham* demonstrates why resorting to cases interpreting isolated phrases from unrelated legislation offers limited help to the task at hand.

*Finally*, and notwithstanding the fact that the text and structure of ERISA show that "governmental plans" constitute a type of "employee welfare benefit plan," the State cites several cases standing for a presumption that the term "person" does not include the sovereign. *See, e.g.*, *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) (holding that a state agency is not a "person" subject to suit under federal False Claims Act); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) (holding that a state is not a "person" under 42 U.S.C. § 1983).  This presumption, of course, does not impose "a hard and fast rule of exclusion."   *Stevens*, 529 U.S. at 781 (quotation omitted).  Rather, the presumption may be "disregarded" in the face of "some affirmative showing of statutory intent to the contrary."   *Id.* (quotation omitted); *see also Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979) ("[M]uch depends on the context, subject matter, legislative history, and executive interpretation.").

41

Whatever force the presumption may carry in other, unrelated contexts is of limited value here due to the text and structure of ERISA. As meticulously explained, Congress defined the term "governmental plan" in direct relation to a state or local government's "employees." 29 U.S.C. § 1002(32). Congress then defined the term "employee" to mean "any individual employed by an employer." *Id.* § 1002(6). Without belaboring the point, "employees" cannot exist without an "employer," either in the real world or in Title 29, Chapter 18, Subchapter I of the United States Code. Thus, in crafting ERISA's definitions, Congress demonstrated its intent to treat governmental employers—including states and their political subdivisions—as "employers," even though Congress also defined the term "employer" in relation to the term "person," which did not explicitly list states and local governments. As one court explained:

> Simply put, an employee welfare benefit plan is a program set up by an employer to provide benefits other than salary or pensions to its employees. Applying that definition [from 29 U.S.C. § 1002(1)] to this case reveals that ***the State of Illinois established an employee welfare benefit plan*** when it mandated that all state employees receive basic health coverage. Viewed this way, it is obvious that the plan at issue in this case is a governmental plan exempt from ERISA because ***the State of Illinois established an employee welfare benefit plan for its employees*** . . . .

*Simac*, 961 F. Supp. at 218 (emphasis added).

This passage shows that the statutory definition of "person" does not prevent governmental plans from being employee welfare benefit plans under ERISA. *Id.*; *accord Lovelace*, 775 F. Supp. at 229-30 ("ERISA regulates employee benefit plans, *such as the plan at issue*, which through the purchase of insurance or otherwise, provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." (emphasis added) (quotation omitted) (finding that school district healthcare plan qualified as an "employee welfare benefit plan" under 29 U.S.C. § 1002(1) but nevertheless was exempt from regulation under the governmental plan exclusion from 29 U.S.C. § 1003(b)(1)).

42

In sum, ERISA, just like the PHSA, plainly contemplates "governmental plans" as a type of "employee welfare benefit plan." As such, the Affordable Care Act, which incorporates ERISA's definition of "employee welfare benefit plan" in defining the term "group health plan" under the Transitional Reinsurance Program, also plainly contemplates "governmental plans" as a type of "group health plan." To the Court's knowledge, states and localities throughout the nation share this understanding and have contributed to the Transitional Reinsurance Program without incident, save except for Ohio and the other six plaintiffs.[9]

### 3.  Canons of Constitutional Avoidance Do Not Compel a Different Result.

The State turns next to canons of constitutional avoidance, arguing that the Court must conclude that the State's healthcare plans are not "group health plans" under the PHSA to avoid serious constitutional questions. (*See, e.g.*, Pls.' Mot. for Summ. J., ECF #18, PageID 138-43 (collecting cases and contending that Congress must make a "clear" or "plain" statement signaling its intent that the Transitional Reinsurance Program applies to state and local governments before reinsurance contributions may be imposed upon them)).

As a threshold matter, the Court questions whether canons of constitutional avoidance carry much weight here, given that the State has failed to present a serious constitutional claim. As explained in Parts III.C.1-C.2., *infra*, the Tenth Amendment permits the federal government to subject state employers to the same regulations that apply to private employers, even when those regulations affect the state treasury. And, as described in Part III.C.3., *infra*, the Intergovernmental Tax Immunity Doctrine poses no obstacle to the federal government subjecting state employers to a nondiscriminatory tax.

_____

[9] All this, despite a very public cry from Warren County Commission president David Young (chief elected official for one of the plaintiffs) imploring other state and local officials to join the fight: "I call on all other affected state and local officials to join us in our stand against this unconstitutional seizing of taxpayer funds . . . ." *See* Stephen Koff, *Ohio, Several State Universities Sue Obama Administration Over Obamacare "Tax,"* The Plain Dealer (Cleveland), Jan. 27, 2015, at A1.

Notwithstanding that threshold question, the State's reliance on canons of constitutional avoidance still falls short. The State relies primarily on *Michigan v. United States*, 40 F.3d 817 (6th Cir. 1994). In *Michigan*, the Sixth Circuit held that investment income of a trust established by a state to assist parents in paying for college was not subject to federal income taxation because Congress made no plain statement authorizing taxation of such income. *Id.* at 824, 829. Echoing language from a concurring opinion in *New York v. United States*, the court set out the relevant statutory test as follows: "[B]efore a federal tax can be applied to activities carried on directly by the States . . . , the intention of Congress to tax them should be stated expressly and not drawn merely from general wording of the statute applicable ordinarily to private sources of revenue." *Id.* at 824 (quoting *New York v. United States*, 326 U.S. 572, 585 (1946) (Rutledge, J., concurring)).

The Sixth Circuit arrived at this "plain statement" rule after citing favorably to other cases "in a variety of non-tax situations." *Id.* (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1984) (requiring an "unequivocal" statement to abrogate sovereign immunity under the Eleventh Amendment), *Will*, 491 U.S at 65 (requiring "unmistakenly clear" language before making states liable under § 1983), and *Gregory v. Ashcroft*, 501 U.S. 452, 461, 470 (1991) (citing "plain statement rule" in holding that federal Age Discrimination in Employment Act did not apply to state court judges so as to avoid thornier constitutional questions)). Applying the same "rule of construction," the Sixth Circuit found that the asserted tax, which applied only to taxable income of "corporation[s]," did not extend to Michigan's education trust, because Congress had not adopted a plain statement "with regard to the investment income . . . of state colleges and universities or other public instrumentalities of the state." *Id.* at 823-24.

44

Query whether the Sixth Circuit over-emphasized Justice Rutledge's concurrence in arriving at its "plain statement" rule.  Indeed, after urging this "plain statement" rule, Justice Rutledge conceded that, "since *South Carolina v. United States*, [199 U.S. 437 (1905)], such a rule of construction *seems not to have been thought required*."  *New York*, 326 U.S. at 586 & n.3 (Rutledge, J., concurring) (emphasis added) (collecting cases).  He then acknowledged that, "although I gravely doubt that when Congress taxed every 'person' it intended to tax every state, *the ruling has been made*, and I therefore acquiesce in this case."  *Id.* (emphasis added).

Query also whether one interpretive canon (requiring a "plain statement" to tax the states) must give way to another (warning against interpreting federal statutes as providing tax exemptions unless those exemptions are "clearly expressed").  *See Chickasaw Nation v. United States*, 534 U.S. 84, 94-95 (2001).  As the Supreme Court has cautioned, canons serve as "guides," not "mandatory rules."  *Id.* at 94.  Moreover, "[s]pecific canons are often countered . . . by some maxim pointing in a different direction."  *Id.* (quotation omitted) ("[T]he canon that assumes Congress intends its statutes to benefit [Native American] tribes is offset by the canon that warns us against interpreting federal statutes as providing tax exemptions unless those exemptions are clearly expressed."); *see N. Arapaho Tribe v. Burwell*, No. 14-CV-247-SWS, 2015 WL 4639324, at *15 (D. Wyo. July 2, 2015) (holding that large employer mandate and related tax from the Affordable Care Act apply to tribal nations despite Congress's failure to specify tribes as large employers; "If Congress wished to exempt Indian tribes from this mandate that otherwise might be reasonably construed as applying to them, it needed to do so explicitly.").  *See generally* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons of About How Statutes are to be Construed*, 3 Vand. L. Rev. 395 (1950) (observing that for every interpretive canon, there lies a canon with equal and opposite force).

45

Regardless of these questions, the State argues that under *Michigan*'s "plain statement" rule, federal statutes must speak with "blinking lights" before they may impose any tax liability on the states or their instrumentalities.  (*See* Pls.' Mot. for Summ. J., ECF #18, PageID 142-43).  The State, however, overplays its hand in demanding "blinking lights."  To the contrary, the Supreme Court time and again has indicated the importance of statutory structure, context, and operation when determining congressional intent—even under "clear" or "plain statement" rules.

For example, in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Court construed "various provisions" of the statute "in . . . context" to determine that Congress had spoken clearly in attempting to abrogate state sovereign immunity, even though its construction led to constitutional questions.  *Id.* at 57 & n.9.  Likewise, in *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000), the Supreme Court found that Congress had spoken clearly in attempting to extend liability under the Age Discrimination in Employment Act of 1967 ("ADEA") to the states, noting that "our cases have never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time."  *Id.* at 76.  Although *Seminole Tribe* and *Kimel* found that Congress exceeded its powers under the Indian Commerce Clause and the Fourteenth Amendment, respectively, the point about clear statement rules remains good law.  Indeed, more recent Supreme Court decisions reflect the same understanding.  *See, e.g.*, *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (holding that Congress need not "incant magic words in order to speak clearly" because courts "consider 'context, including the Court's interpretations of similar provisions in many years past,'" when facing clear statement rules (quotation omitted)); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 133, 141 (2004) (recognizing that "statutory structure" can satisfy a clear statement rule and looking to "a broader frame of reference," including "the practical operation and effect" of the law in-question).

46

Lower courts have followed suit. For example, in *Shweika v. Department of Homeland Security*, 723 F.3d 710 (6th Cir. 2013), the Sixth Circuit acknowledged that "Congress may nevertheless make a clear statement even if it does not use 'magic words.'" *Id.* at 715 (quotation omitted). There, the court looked to statutory "context" and "the function of" the relevant provision to determine whether Congress spoke clearly in imposing a jurisdictional limitation on judicial review, ultimately concluding it had not. *Id.* at 715-17. The same holds true in tax cases and cases involving state challenges to purported federal overreach. *See Abraitis v. United States*, 709 F.3d 641, 644 (6th Cir. 2013) (tax case) ("[T]he Supreme Court counsels that the clear statement need not consist of 'magic words,' and we may consider the Court's treatment of similar provisions as context."); *Ameritech*, 403 F.3d at 912-13 (purported federal overreach case) (looking to text, structure, and purpose of Electronic Communications Privacy Act before concluding that "[t]he language of [the relevant provisions] taken together is enough to satisfy any plain-statement requirement for application of federal law to the states").

And, in a recent Affordable Care Act challenge, the Wyoming District Court concluded that "[s]tate and local governments are likewise subject to the large employer mandate," which levies a tax on certain employers who do not provide qualifying healthcare to their employees, even though the statute establishing the tax does not include "states" or "local governments" in its definition of the entities to be taxed—"applicable large employer[s]." *See Arapaho Tribe*, 2015 WL 4639324, at *3 (citing I.R.C. § 4980H); *see also* I.R.C. § 4980H(c)(2)(A) ("The term 'applicable large employer' means . . . an employer who employed an average of at least 50 full-time employees on business days during the preceding calendar year."). In so doing, the court relied solely on context and related statutory provisions that contemplated the states' inclusion. *See Arapaho Tribe*, 2015 WL 4639324, at *3.

47

Under this framework, Congress has spoken clearly enough in imposing contributions on private- and public-sector employers alike under the Transitional Reinsurance Program. In this case, the PHSA contains several "plain statements" indicating that "non-Federal governmental plans" offering medical care constitute "group health plans." These include the provision permitting non-Federal governmental plans to "opt out" from certain requirements that apply to all other group health plans, 42 U.S.C. § 300gg-21(a)(2)(A), the PHSA enforcement mechanism and penalty provisions, which apply specifically to "group health plans that are non-Federal governmental plans," *id.* § 300gg-22(b)(1)(B), (b)(2)(B)(ii), and the ACA's reorganization of the PHSA to limit the number of requirements imposed on group health plans from which self-insured non-Federal governmental plans can opt out. As in *Ameritech* and other cases, although the ACA does not itself define the term "group health plan," the PHSA "uses that phrase in several sections in ways that make application to state and local governments unmistakable." *See Ameritech*, 403 F.3d at 912; *see also Arapaho Tribe*, 2015 WL 4639324, at *3.

ERISA likewise contains several "plain statements" indicating that "governmental plans" constitute a type of "employee welfare benefit plan," and thus, a "group health plan" under the PHSA's cross-referenced definition as well. These include the definition of "governmental plan" under 29 U.S.C. § 1002(32), which plainly contemplates state and local governments serving as "employers" with respect to their employee welfare benefit plans, and the governmental plan exclusion from 29 U.S.C. § 1003(b)(1). Because the court must "consider context, including . . . interpretations of similar provisions in many years past," in looking for a clear statement from Congress, *see Sebelius*, 133 S. Ct. at 824 (quotation omitted), the Court cannot ignore cases that found that "governmental plans" constitute a type of "employee welfare benefit plan" under ERISA, *see, e.g.*, *Simac*, 961 F. Supp. at 218; *Lovelace*, 775 F. Supp. at 229-30.

Indeed, there are far more indications of congressional intent here than there were in *Michigan*, on which the State relies so heavily. Recall that in *Michigan*, the question was whether a state education trust was subject to a federal tax imposed upon "every corporation" under I.R.C. § 11(a). *See Michigan*, 40 F.3d at 823. There, the federal government could identify *no* indications that Congress intended to tax state trusts, going so far as to *concede* that "this section has never been interpreted as imposing a tax on income earned directly by a state, a political division of a state, or 'an integral part of a State.'" *Id.* Moreover, the court pointed to sixty years of guidance from the Internal Revenue Service and its predecessor agency indicating that states did not fall within the Internal Revenue Code's definition of "corporation." *Id.* (citations omitted). As explained above, that is not this case.

And, as a practical matter, the Court takes note that state and local government employers throughout the country have endeavored to comply with the Transitional Reinsurance Program by making the required payments—further underscoring that Congress spoke sufficiently clearly when levying those contributions on all "group health plans."[10] *See* 42 U.S.C. § 18061.

---

[10] *See, e.g.*, Massachusetts Office for Administration and Finance, *Transitional Reinsurance Tax Guidance for Municipalities and Offline Agencies*, http://www.mass.gov/anf/employee-insurance-and-retirement-benefits/coordinator-information/gic-coordinator-news/transitional-reinsurance-tax-guidance.Html (last visited Dec. 4, 2015) ("The [Massachusetts Group Insurance Commission] has paid the [reinsurance] tax to CMS on behalf of all members of its self-insured plans."); Nevada Public Employees' Benefits Program Board, *Presentation of Fiscal Year 2014 Audited Financial Statements*, 12 (Nov. 20, 2014), https://pebp.state.nv.us/brdpkts/11-20-14BoardPacket.pdf ("The following adjustments were identified as a result of audit procedures: . . . . An entry to accrue the Transitional Reinsurance Fee incurred as of June 30, 2014 in the amount of $1,088,829 that was approved by management."); Aon Hewitt, *New Jersey State Health Benefits Commission, State Health Benefits Program (SHBP)—Local Government Group Plan Year 2016 Medical/Rx Rate Renewal Recommendation*, 3 (July 17, 2015), http://www.state.nj.us/treasury/pensions/pdf/hb/rate-renewal-disc-local-gov-2016.pdf ("The Transitional Reinsurance Fee ($27 per non-Medicare member in Plan Year 2016), is projected to add $3.8 million to SHBP Local Government Group plan costs."); Texas Legislative Budget Board, *Texas State Government Effectiveness and Efficiency Report*, 3 (Jan. 2013), http://www.lbb.state.tx.us/Documents/Publications/GEER/Government%20Effectiveness%20and%20Efficiency%20Report%202012.pdf ("[The Employee Retirement System] also anticipates a state cost of $35 million for the 2014-15 biennium for a transitional reinsurance fee. This fee is assessed on plans to help stabilize the health insurance market when health insurance exchanges become operational.").

49

In sum, the federal government's argument that the Transitional Reinsurance Program applies to state and local government employers is not "drawn merely from general wording of the statute applicable ordinarily to private sources of revenue," *see Michigan*, 40 F.3d at 823, but, rather, is drawn from the specific language, structure, and context of the PHSA and ERISA. Those provisions together make clear that governmental plans offering qualifying medical care constitute "group health plans" for purposes of reinsurance contributions.

The State of Ohio's statutory arguments do not pose the first challenge to the Affordable Care Act, nor is this Court under any illusion that this case represents the last attempt to strike down the law, in whole or in part, on the basis of an alleged statutory infirmity. *See King*, 135 S. Ct. at 2492.  As in previous Affordable Care Act cases, however, this Court's role is not to "consider whether the Act embodies sound policies."  *NFIB*, 132 S. Ct. at 2577. "That judgment," the Supreme Court wisely explained, "is entrusted to the Nation's elected leaders."  *Id.*  Instead, this Court's role remains confined to determining whether Congress intended and plainly understood the term "group health plan," as used in 42 U.S.C. § 18061(b), to encompass qualifying state and local government healthcare plans.  As explained above, the Court finds that Congress did so intend, and for good reason.  Interpreting the Transitional Reinsurance Program to *exclude* payments from public-sector employers who offer qualifying group health plans would deprive the program of significant revenue necessary to ward off "the very 'death spirals' that Congress designed the Act to avoid."  *See King*, 135 S. Ct. at 2493; *see also id.* at 2485-87 (explaining the care Congress took to ensure that the "guaranteed issue" and "community rating" reforms from the ACA would not lead to "adverse selection" and "economic 'death spiral[s]'" in the individual insurance markets).  As in *King*, the Court opts not to construe the Affordable Care Act at odds with its own stated purpose.  *Id.* at 2496.

### C.  The Transitional Reinsurance Program Does Not Violate the Constitution.

Without a winning statutory argument, the State turns next to its constitutional claims. (*See* Pls.' Am. Compl., ECF # 13, ¶¶ 91-99) (Count Three).  The State argues that subjecting its self-insured group health plans to the same regulations that govern group health plans offered by *private*-sector employers violates the Constitution under either the Tenth Amendment or the Intergovernmental Tax Immunity Doctrine.  Here again, the Court's role is not to sit in judgment of the *wisdom* of the Affordable Care Act but, rather, to "ask only whether Congress has the power under the Constitution to enact the challenged provisions."  *NFIB*, 132 S. Ct. at 2577.  As explained below, the State's constitutional arguments lack merit because the Transitional Reinsurance Program regulates state and local governments in their capacity as employers, does not commandeer the legislative or executive functions of state or local governments, and does not discriminate against state or local governments in the assessment of reinsurance contributions.

### 1.  The Transitional Reinsurance Program Does Not Violate the Tenth Amendment as an Affront to State Sovereignty.

The State of Ohio first contends that the Transitional Reinsurance Program, as applied to state and local governments, violates the concept of structural federalism inherent in the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  *See* U.S. Const. amend. X.  In short, the State argues that the Transitional Reinsurance Program "has no analogue" in federal-state relations and, if applied to state and local governments, would "affront[] the Constitution's vertical separation of powers" and destroy the very "liberty-enhancing constitutional protections" that our Founding Fathers envisioned. (*See* Pls.' Mot. for Summ. J., ECF #18, PageID 156-57).

Putting this lofty language aside, however, the Supreme Court has held that the Tenth Amendment poses no direct obstacle to Congress holding state employers to the same regulatory standards that govern private-sector employers. *See Garcia v. San Antonio Metro. Trans. Auth.*, 469 U.S. 528, 554 (1985) (finding no Tenth Amendment violation where government employer "faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet"), *overruling Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976). When Congress lawfully exercises its power under the Commerce Clause, state and local governments cannot avoid complying with the resulting regulation simply by pointing to a "sacred province of state autonomy." *Id.* (quotation omitted); *see also, e.g.*, *Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 555 n.2 (6th Cir. 1987) (explaining that "[t]he traditional concept of state sovereignty is, of course, no longer the focus of this analysis"); *Dressman v. Costle*, 759 F.2d 548, 557 (6th Cir. 1985) (holding that Kentucky counties' Tenth-Amendment challenge to the Clean Air Act "obviously fails" under *Garcia*).

Instead, states must seek relief from federal regulation of state economic activities through the political process. *Garcia*, 469 U.S. at 554 ("[W]e are convinced that the fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the 'States as States' is one of process rather than one of result."); *South Carolina v. Baker*, 485 U.S. 505, 512 (1988) ("*Garcia* holds that the limits are structural, not substantive—*i.e.*, that States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity.").[11]

---

[11] Although *Garcia* "left open the possibility that some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment," the Supreme Court has never identified or defined the defects that might lead to such invalidation. *Baker*, 485 U.S. at 512. Instead, it "suffices" to sink a Tenth-Amendment claim where, as here, the state "has not even alleged that it was deprived of any right to participate in the national political process or that it was singled out in a way that left it politically isolated and powerless." *Id.*

Indeed, after *Garcia*, courts and commentators widely accept that the federal government may subject state and local government employers to the same standards that apply to private-sector employers.  *See, e.g.*, *EEOC v. Ky. Ret. Sys.*, 16 F. App'x 443, 452 (6th Cir. 2001) (explaining that Congress may enact "generally applicable laws that regulate state activities in the same manner as private conduct" without violating the Tenth Amendment); Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law—Substance and Procedure § 4.10(d)(ii)(6) (2014) ("Until such time as *Garcia* might be overruled, the Court will not create a judicially enforceable limit on the extent of the federal commerce power to subject state and local governments to commercial regulations of the type that govern private sector activities."). *Garcia* thus forecloses any argument that "the States as States" are immune from making contributions under the Transitional Reinsurance Program.  *See Garcia*, 469 U.S. at 554.

2.  The Transitional Reinsurance Program Does Not Violate the Tenth Amendment as an Effort
     to "Commandeer" State or Local Governments Into Regulating Their Citizens.

The State next argues that Congress violated the Tenth Amendment by "commandeering" the regulatory apparatuses of state and local governments.  The Supreme Court has, on two occasions, rejected Congress's efforts to "commandeer" state legislative or executive branch powers to serve federal ends.  *See New York v. United States*, 505 U.S. 144, 175-76 (1992) (striking down federal law that required states to develop legislation on disposal of radioactive waste or be forced to take title to it because Congress impermissibly sought to "commandeer" the legislative process of the states); *Printz v. United States*, 521 U.S. 898, 935 (1997) (striking down a provision from Brady Handgun Act that required state and local law enforcement officers to conduct background checks on gun purchasers).  Together, "*New York* and *Printz* stand for the unexceptionable proposition that Congress cannot force the states to enact or administer a federal regulatory regime."  *Cutter v. Wilkinson*, 423 F.3d 579, 589 (6th Cir. 2005).

53

In pressing its commandeering argument, the State overlooks a key point.  The Supreme Court's "anti-commandeering" cases distinguish between "generally applicable laws that regulate state activities in the same manner as private conduct," which are permissible, and laws "that seek to control or influence the manner in which the States regulate private conduct," which are not.  *See Ky. Ret. Sys.*, 16 F. App'x at 452.  In other words, when a federal statute regulates a state—rather than requiring a state to regulate its own citizens—there is no constitutional violation.  *See Baker*, 485 U.S. at 513-14 (upholding federal tax law because challenged provision "regulates state activities" rather than "seek[ing] to control or influence the manner in which States regulate private parties"); *Reno v. Condon*, 528 U.S. 141, 151 (2000) (following *Baker* and upholding federal privacy law as applied to state motor vehicle database because the statute "does not require the States in their sovereign capacity to regulate their own citizens").

For example, in *Baker*, the Supreme Court upheld a change to federal tax law that "effectively prohibits" state and local governments from "issuing unregistered bonds," reasoning that the law was indistinguishable from the type of generally applicable federal regulation accorded deference under *Garcia*.  *See Baker*, 485 U.S. at 513-15.  The *Baker* Court thus rejected South Carolina's "anti-commandeering" challenge, despite the fact that "many state legislatures had to amend a substantial number of statutes in order to issue bonds in registered form" and many "state officials had to devote substantial effort to determine how best to implement a registered bond system."  *Id.* at 514.  In the words of the Supreme Court: "Such 'commandeering' is, however an inevitable consequence of regulating a state activity.  Any federal regulation demands compliance.  That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is . . . commonplace [and] presents no constitutional defect."  *Id.* at 514-15.

Later, in *Condon*, the Supreme Court "reaffirmed the distinction between generally applicable laws that regulate state activities in the same manner as private conduct and those that seek to control or influence the manner in which the States regulate private conduct." *Ky. Ret. Sys.*, 16 F. App'x at 452 (citing *Condon*, 528 U.S. at 141). There, the Court upheld the federal Driver's Privacy Protection Act ("DPPA"), which established "a regulatory scheme that restricts the State's ability to disclose a driver's personal information without the driver's consent." *Condon*, 528 U.S. at 144. The Court explained that, unlike in *New York* and *Printz*, which struck down federal laws under the Anti-Commandeering Doctrine, "[i]n *Baker*, we upheld a statute that prohibited States from issuing unregistered bonds because the law 'regulated state activities,' rather than 'seeking to control or influence the manner in which States regulate private parties.'" *Id.* at 150 (brackets omitted) (quoting *Baker*, 485 U.S. at 514). The Court reasoned that, "[l]ike the statute at issue in *Baker*, the DPPA does not require the States in their sovereign capacity to regulate their own citizens." *Id.* at 151. Instead, "[t]he DPPA regulates the States as the owners of data bases." *Id.* Accordingly, the Court concluded that "the DPPA is consistent with the constitutional principles enunciated in *New York* and *Printz*." *Id.*

Here, as in *Baker* and *Condon*, the Transitional Reinsurance Program passes muster under the Tenth Amendment as a "generally applicable law[] that regulate[s] state activities in the same manner as private conduct." *See Ky. Ret. Sys.*, 16 F. App'x at 452. The Transitional Reinsurance Program does not impermissibly "seek to control or influence the manner in which the States regulate private conduct." *See id.* Nor does the program "force the states to enact or administer a federal regulatory scheme." *See Cutter*, 423 F.3d at 589. Instead, the Transitional Reinsurance Program simply requires the health plans offered by state and local employers to make contributions on the same terms as those plans offered by all other employers.

The State tries to avoid this result by blurring these key distinctions from the Supreme Court's anti-commandeering cases into non-existence. The State argues that a nondiscriminatory federal statute which imposes financial consequences on a state government *necessarily* commandeers it, since the state will need to raise any required funds from its own citizens. (*See* Pls.' Mot. for Summ. J., ECF #18, PageID 159 ("To get money to pay the asserted federal tax, states must take action to collect it somehow from their citizens."); *id.* at 160 ("[T]he challenged program . . . dragoons Ohio into amassing and paying over the tax dollars . . . .")).

The Supreme Court does not share this view. To the contrary, the Court has rejected the argument that a federal statute requiring the expenditure of state funds to comply with it amounts to a Tenth-Amendment violation—both in cases that preceded *New York* and *Printz*—and in cases that followed. For example, in *Maryland v. Wirtz*, 392 U.S. 183 (1968), the Supreme Court rejected the argument that extending FLSA wage and overtime pay provisions to the states would violate state sovereignty by telling public hospitals and schools how to carry out their sovereign functions. *Id.* at 193-95. In the process, the majority declined to adopt a similar argument to the one the State now makes—*i.e.*, that the federal government's attempt to regulate the wages and conditions of employment in the national labor market, which would adversely impact state treasuries, doomed such an attempt under the Tenth Amendment. *See id.* at 203 (Douglas, J., dissenting) (stating "[t]here can be no doubt" that if the FLSA were extended to the states it would "disrupt [their] fiscal policy . . . and threaten their autonomy" and further suggesting that the FLSA would "overwhelm state fiscal policy"). True enough, *Wirtz*, which held that state employers *are* subject to the FLSA, was overruled by *National League of Cities*, which held that certain state employers were *not* subject to the FLSA. But *National League of Cities* was then again overruled by *Garcia*, placing *Wirtz* back on solid ground.

*Garcia*, of course, charted the same path with respect to concerns over the state treasury as they relate to the Tenth Amendment. There, the majority *again* declined to adopt the State's now-familiar argument that generally applicable federal legislation which impacts state finances (even drastically so) violates the Constitution—despite the dissent's strong protestations to the contrary. *See Garcia*, 469 U.S. at 557, 578 (Powell, J., dissenting) ("The financial impact on States and localities of displacing their control over wages, hours, overtime regulations, pensions, and labor relations with their employees could have serious, as well as unanticipated, effects on state and local planning, *budgeting, and the levying of taxes*." (emphasis added)). To be sure, neither *Wirtz* nor *Garcia* addressed the Tenth-Amendment challenge in the parlance of the Court's modern "Anti-Commandeering Doctrine," but the point remains valid.

Indeed, in *Baker*, where the Supreme Court *did* address an "anti-commandeering" challenge head-on, the Court reinforced its earlier view on the impact of federal legislation to state treasuries by explaining that "[a]ny federal regulation demands compliance," which may require "substantial effort" on behalf of state and local governments. *See Baker*, 485 U.S. at 514 (acknowledging that "state officials had to devote substantial effort to determine how best to implement a registered bond system" and that "many state legislatures" had to expend time and resources "amend[ing] a substantial number of statutes" to comply with the federal law). There, the Court noted with approval that, "[a]fter *Garcia*, for example, several States and municipalities had to take administrative and legislative action . . . *or raise the funds necessary to comply* with the wage and overtime provisions of the [Fair] Labor Standards Act." *Id.* at 515 (emphasis added)). But this form of "'commandeering,'" the Court explained, is "inevitable," "commonplace," and "presents no constitutional defect," so long as the statute does not "seek to control or influence the manner in which States regulate private parties." *Id.* at 514-15.

57

Further proving the point, in *Condon* (which post-dates both *New York* and *Printz*), the Supreme Court unanimously rejected an anti-commandeering challenge, even though the Court "agree[d] with South Carolina's assertion" that the DPPA "requires the State's employees to learn and apply the Act's substantive restrictions, . . . [and] that these activities will consume the employees' time and thus the State's resources." *Condon*, 528 U.S. at 150. Nonetheless, because the DPPA "does not require state officials to assist in the enforcement of federal statutes regulating private individuals," the Court rejected South Carolina's anti-commandeering claim. *Id.* at 151. In so doing, the Court also rejected reliance on "either *New York* or *Printz*," holding instead that "this case is governed by our decision in *South Carolina v. Baker*." *Id.* at 150.

This steady drumbeat of cases demonstrates the fallacy with the State's commandeering-through-financial-impact argument. This line of cases also explains why the State could not point to a single decision from any court that adopted such a theory in declaring a federal statute unconstitutional. If anything, a more recent decision involving the large employer mandate from the Affordable Care Act brings the matter home. In *Florida ex rel. McCollum v. United States Department of Health & Human Services*, 716 F. Supp. 2d 1120 (N.D. Fla. 2010), the State of Florida (and a host of other states) brought a facial challenge to the Affordable Care Act. The states argued that the large employer mandate, which requires all employers with more than fifty full-time employees to provide qualifying healthcare to their employees, would "interfere with the states' sovereignty as large employers and in the performance of governmental functions." *Id.* at 1130 (describing Count VI from the complaint). After discussing the states' Tenth-Amendment challenge, which hinged largely on the cost of providing these "extensive" and "expensive" new benefits, and assessing the relevant cases, including *Wirtz*, *National League of Cities*, *Garcia*, *New York*, and *Condon*, the court dismissed Count VI. *Id.* at 1151-54.

58

The court first acknowledged the states' argument that "the employer mandate will interfere with their sovereignty . . . insofar as it will be financially burdensome." *Id.* at 1153. But the court noted that "virtually any and all attempts to regulate the wages and conditions of employment in the national labor market (which Congress has long done) will result in similar restrictions and adversely impact the state fisc." *Id.* (citing *Wirtz* and *Garcia*).  This impact, the court held, is not enough to state a Tenth-Amendment claim.  *Id.*  To the contrary, the court saw "no persuasive reason why healthcare benefits—which are generally viewed as a condition of employment and part of an employee's compensation package—should be treated differently than other aspects of compensation and conditions of employment that the Supreme Court has already held Congress may regulate and mandate against the states."  *Id.*  Accordingly, "[b]ecause the Act's employer mandate regulates the states *as participants in the national labor market the same as it does private employers*, and because the Supreme Court has held in this context that *adversely impacting the state fisc . . . does not interfere with state sovereignty*," the court held that "the employer mandate does not violate the Constitution as a matter of law." *Id.* at 1154 (emphasis added) (dismissing Count VI).[12]

---

[12] The plaintiffs, who by then included the State of Ohio, opted not to appeal the district court's dismissal of Count VI.  *See Fla. v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1240-41 & n.2 (11th Cir. 2011) (listing arguments on appeal).  In their petition for a writ of certiorari, however, the state plaintiffs asked the Supreme Court to consider several issues, including the following:

> Question 2: May Congress treat States no differently from any other employer when imposing invasive mandates as to the manner in which they provide their own employees with insurance coverage, as suggested by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), or has *Garcia*'s approach been overtaken by subsequent cases in which this Court has explicitly recognized judicially enforceable limits on Congress's power to interfere with state sovereignty?

Petition for Writ of Certiorari, *Fla. v. U.S. Dep't of Health & Human Servs.*, 132 S. Ct. 2566 (2012) (No. 11-400), 2011 WL 4500702, at *i; *see also id.* at *27-28 (arguing that the Court should strike down the employer mandate because *New York* and *Printz* had supplanted *Garcia*).  Although the Supreme Court granted the petition as to several questions, Question 2 was not one of them.  *See Dep't of Health & Human Servs. v. Florida*, 132 S. Ct. 604 (2011).  Thus, the district court's opinion remains good law.

*Florida* is instructive, because it underscores the Tenth-Amendment principles relevant to this case, against a regulatory mandate far more expensive (and long-lasting) than the one imposed under the Transitional Reinsurance Program. Where, as here, Congress subjects a state employer to the same standards that govern private-sector employers, Congress does not violate the Tenth Amendment, even if the state treasury is impacted. *See, e.g.*, *Garcia*, 469 U.S. at 554; *Baker*, 485 U.S. at 513-15; *Condon*, 528 U.S. at 151; *Florida*, 716 F. Supp. 2d at 1151-54. In contrast, where Congress directs a state government to regulate its own citizens, Congress "commandeers" state regulatory apparatuses in violation of the Tenth Amendment. *See New York*, 505 U.S. at 175-76; *Printz*, 521 U.S. at 935. This Circuit and others agree. *See Ky. Ret. Sys.*, 16 F. App'x at 152; *see also Ivy v. Williams*, 781 F.3d 250, 254 (5th Cir. 2015) ("[Texas's] argument misses the mark. While the federal government cannot require states to implement a federal program, the federal government *can* require the states to comply with federal law."). The Affordable Care Act requires Ohio and its instrumentalities and political subdivisions to *comply* with a federal regulatory program, not to implement one. Accordingly, the Court rejects the State's anti-commandeering argument.

### 3. The Transitional Reinsurance Program Does Not Violate the Intergovernmental Tax Immunity Doctrine.

Finally, the State argues that the Transitional Reinsurance Program runs afoul of the Intergovernmental Tax Immunity Doctrine—an older creed that once counseled against the federal and state governments taxing one another. *See New York v. United States*, 326 U.S. 572, 575 (1946) ("[T]he fear that one government may cripple or obstruct the operations of the other early led to the assumption that there was a reciprocal immunity of the instrumentalities of each from taxation by the other."); *see also Baker*, 485 U.S. at 518 n.11 (describing historical sources and contours of the Intergovernmental Tax Immunity Doctrine).

The State's reliance on the Intergovernmental Tax Immunity Doctrine is misplaced, however, because that doctrine has "severely eroded with the passage of time," and now protects only against *discriminatory* taxes levied directly on the states.  *See Michigan*, 40 F.3d at 822-23. Here, the Transitional Reinsurance Program imposes reinsurance contributions on private-sector employers and state and local government employers equally—*i.e.*, non-discriminatorily.  That is all the Constitution requires.  *Id.* at 823.

Any proper discussion of the Intergovernmental Tax Immunity Doctrine must begin with *New York v. United States*.  There, the Supreme Court upheld a generally applicable federal tax imposed on the sale of mineral water, even though the tax reached the State of New York through its bottling and sale of such water from Saratoga Springs.  *New York*, 326 U.S. at 573-74.  In so doing, the Court took a long walk through the annals of its tax-immunity cases, stopping at one point to describe the then-accepted view that public instrumentalities of a state were constitutionally immune from taxation insofar as they performed a "governmental function," as opposed to a proprietary or "business" function.  *Id.* at 579-80.  In upholding the sales tax, the Court abandoned that governmental-function distinction as "steril[e]," *id.* at 580, and "untenable," *id.* at 586 (Stone, C.J., concurring), though no single explanation mustered a majority of votes from the eight participating justices.  Two justices reasoned that *any* non-discriminatory tax imposed on a state was constitutional, even if collected directly from the state. *Id.* at 582-84 (Frankfurter, J., joined by Rutledge, J.).  Four other justices appeared to recognize a further limitation, noting that a non-discriminatory tax could be unconstitutional if it "interfere[s] unduly with the State's performance of its sovereign functions of government."  *See id.* at 587-89 (Stone, C.J., concurring, joined by Reed, Murphy, & Burton, JJ.) (finding the tax to be constitutional because it did not "unduly impair the State's functions of government").

Since *New York*, the Supreme Court has not provided meaningful clarification with respect to the limits on direct federal taxation of the states. The Court has, however, upheld Congress's power to tax the states *indirectly* (so long as the tax is non-discriminatory) and to require states to pay user fees. *See Baker*, 485 U.S. at 523 (upholding a law requiring state and local bonds to be issued in "registered" form for bondholders to be exempt from federal tax, reasoning that the modern interpretation of the Intergovernmental Tax Immunity Doctrine permits such indirect taxation even if some financial burden falls on the state—unless the tax is discriminatory); *Massachusetts v. United States*, 435 U.S. 444, 466-67 (1978) (upholding a federal user fee on a state when "the charges do not discriminate against state functions, are based on a fair approximation of the use of the system, and are structured to produce revenues that will not exceed the total cost to the Federal government of the benefits to be supplied").

In both *Massachusetts* and *Baker*, the Supreme Court indicated that, as with the Tenth Amendment: (1) the key limiting principle is that the tax must not discriminate against states; and (2) the chief remedy from such taxation lies in the national political process. For example, in *Massachusetts*, the Court noted that there were "cogent reasons" for "narrowly limiting the immunity of the States from federal imposts," including the long-recognized view "that the political process is uniquely adapted to accommodating competing demands 'for national revenue, on the one hand, and for reasonable scope for the independence of state action, on the other.'" *Massachusetts*, 435 U.S. at 456 (citing *McCulloch v. Maryland*, 4 Wheat. 316, 435-36 (1819), and quoting *Helvering v. Gerhardt*, 304 U.S. 405, 416 (1938)). As the Court remarked, "[t]he Congress, composed as it is of members chosen by state constituencies, constitutes an inherent check against the possibility of abusive taxing of the States by the National Government." *Id.* at 456 & n.3 (foreshadowing *Garcia*'s reversal of *National League of Cities*).

And in *Baker*, the Court rejected an approach urged by Justice O'Connor's dissent, which would assess the constitutionality of each tax imposed indirectly on state and local governments by determining whether the tax had "substantial" adverse effects on those governments.  *Baker*, 485 U.S. at 525 n.15.  The Court instead noted that "[t]he nondiscrimination principle at the heart of modern intergovernmental tax immunity case law does not leave States unprotected from excessive federal taxation—it merely recognizes that the best safeguard against excessive taxation (and the most judicially manageable) is the requirement that the government tax in a nondiscriminatory fashion."  *Id.*  The Court then observed that judges cannot find a tax "excessive" without "second-guessing" the political process and "the extent to which the taxing government and its people have taxed themselves."  *Id.*  Finally, the Court rejected Justice O'Connor's fear that, without a substantive safeguard, "we leave States at the mercy of a congressional power to destroy them via excessive taxation."  *Id.*  Instead, the Court concluded that political checks would prevent such a result: "[T]he threat of destroying another government can only be realized if the taxing government is willing to impose taxes that will also destroy itself or its constituents."  *Id.*; *see also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 200 n.17 (1994) (explaining that in the "field of intergovernmental taxation . . . nondiscrimination . . . plays a central role in setting the boundary between the permissible and the impermissible" and noting that "political check[s]" from taxpayers prevent "unfair burdens" on the government that must pay the non-discriminatory tax (quotation omitted) (citing *Baker*, 485 U.S. at 525 n.15)).[13]

___

[13] *Baker* involved an indirect tax—one levied on individual bondholders, not the states themselves.  *See Baker*, 485 U.S. at 526.  But as Justice O'Connor explained, the Special Master appointed to assist in that case found that "States will have to increase the interest rates they pay on bonds by 28%-35% if the interest is subject to the federal income tax."  *Id.* at 541 (O'Connor, J., dissenting); *see also id.* at 510 (majority opinion).  In other words, if the tax were imposed on bondholders, the states' cost of raising capital would "rise[] by one-third," thus "strik[ing] at the very heart of state and local government activities" and posing "devastating effects . . . on state and local governments."  *Id.* at 531-33 (O'Connor, J., dissenting).  Accordingly, *Baker* remains instructive for direct-taxation cases as well.

In light of *New York*, *Baker*, and the Supreme Court's continued narrowing of the Intergovernmental Tax Immunity Doctrine, lower courts—including the Sixth Circuit—generally understand that Congress remains "free to impose a non-discriminatory tax" directly on the states, "if it wants to."  *See Michigan*, 40 F.3d at 823.  As the Sixth Circuit has explained, "[t]he broad constitutional immunity from federal taxation once thought to be enjoyed by states . . . has been severely eroded with the passage of time, and several years ago the Supreme Court suggested that it is now an open question whether there is 'any' extent 'to which States are currently immune from direct non-discriminatory federal taxation.'"  *Id.* at 822 (quoting *Baker*, 485 U.S. at 518 n.11).  Thus, in *Michigan*, the court concluded that Congress could levy a direct tax on the investment income of state agencies without violating the Constitution so long as the tax applied to *all* similar entities, public or private, even-handedly.  *See id.* at 818, 823 ("[W]e are confident that today's Supreme Court would say that Congress is free to impose a non-discriminatory tax on the investment income at issue here if it wants to.").

The Seventh Circuit views the scope of the Intergovernmental Tax Immunity Doctrine similarly.  *See Travis v. Reno*, 163 F.3d 1000, 1002-03 (7th Cir. 1998) (Easterbrook, J.).  In *Travis*, the court confronted the same privacy statute (the Driver's Privacy Protection Act) that the Supreme Court ultimately upheld in *Reno v. Condon*.  *See id.* at 1001-02 (describing the DPPA; noting that it "deprives [Wisconsin] of approximately $8 million in annual revenue"; and listing various statutory violations, which "are punishable by fines up to $5,000 per day").  In a precursor to *Condon*, the Seventh Circuit upheld the DPPA too, concluding that "whatever may be said about the [DPPA's] wisdom, it is within the commerce power and compatible with constitutional principles of federalism."  *Id.* at 1001-02.  In discussing one of those "principles of federalism," the Intergovernmental Tax Immunity Doctrine, the court had this to say:

> Gradually intergovernmental immunity turned into a rule of nondiscrimination, under which the governmental body's protection is vicarious: one government may tax . . . another's trading partners only to the extent it imposes equivalent burdens on those who do business with private citizens. Neutrality between governmental and private spheres is a principal ground on which the Supreme Court has held that states may be subjected to regulation when they participate in the economic marketplace—for example, by hiring workers covered by the Fair Labor Standards Act. So long as public market participants are treated the same as private ones, they enjoy the protection the latter have been able to secure from the legislature; and as Congress is not about to destroy private industry (think what that would do to the tax base!) it cannot hobble the states either.

*Id.* at 1002-03 (citations omitted) (collecting cases, including *Garcia v. San Antonio Metropolitan Transit Authority* and *South Carolina v. Baker*). Although *Travis* was not strictly a tax case, this passage underscores the Sixth Circuit's approach in *Michigan*, where the court held that Congress may impose taxes directly on the states so long as those taxes do not discriminate between the states and private parties. *See Michigan*, 40 F.3d at 823.

Finally, in *Florida ex rel. McCollum*, the Northern District of Florida rejected a constitutional challenge to the large employer mandate from the Affordable Care Act on a similar basis. *See Florida*, 716 F. Supp. 2d at 1154 n.14. There, the court agreed that the states' argument "that the employer mandate runs afoul of the inter-governmental-tax-immunity doctrine . . . must fail as a matter of law." *Id.* Indeed, the court noted, "under the current state of the law, it is unclear if the inter-governmental-tax-immunity even retains any viability." *Id.*; *see also id.* at 1154 ("Because the Act's employer mandate regulates the states as participants in the national labor market the same as it does private employers . . . , the employer mandate does not violate the Constitution . . . ."); *cf. Minn. ex rel. Hatch v. United States*, 102 F. Supp. 2d 1115, 1122 (D. Minn. 2000) ("[T]he so-called nondiscrimination rule . . . prohibits Congress from taxing the states as states. It has no applicability in this litigation, where there is no contention that Congress has singled out the states for different treatment than private individuals.").

Under this line of cases, the State's tax-immunity argument fails. The Transitional Reinsurance Program imposes reinsurance contributions on public and private group health plans in an even-handed, non-discriminatory manner. *All* qualifying group health plans must pay $63.00 per covered enrollee in benefit year 2014, $44.00 per enrollee in benefit year 2015, and $27.00 per enrollee in benefit year 2016. No more; no less. As the Sixth Circuit has stated, the 111th Congress, which the people elected, was "free to impose [this] non-discriminatory tax" on state and local governments, "if it want[ed] to." *See Michigan*, 40 F.3d at 823. And, as previously described in Section III.B., *supra*, Congress wanted to and has done so.

At oral argument, the State conceded that the Transitional Reinsurance Program imposes a nondiscriminatory tax. When pressed as to *how* such a nondiscriminatory tax violates the Intergovernmental Tax Immunity Doctrine, the State relied primarily on a footnote from *Baker*, in which the Supreme Court hinted that the scope of the doctrine remains an open question with respect to nondiscriminatory taxes levied *directly* on the states. *See Baker*, 485 U.S. at 523 n.14 ("We need not concern ourselves here, however, with the extent to which, *if any*, States are currently immune from *direct* federal taxation." (emphasis added)). As explained, however, lower courts have filled in the gaps since *Baker* by concluding that Congress *may* impose direct taxes on the states, so long as those taxes apply even-handedly to public and private entities. *See Michigan*, 40 F.3d at 823 (concluding that the Intergovernmental Tax Immunity Doctrine had devolved into a rule of nondiscrimination); *Florida*, 716 F. Supp. 2d at 1154 n.14 (similar). Furthermore, even if the law remains unsettled following *Baker*, that is reason enough to uphold the Transitional Reinsurance Program, which is entitled to a presumption of constitutionality. *See Reno*, 528 U.S. at 148 ("We of course begin with the time-honored presumption that the DPPA is a constitutional exercise of the legislative power." (quotation omitted)).

Moreover, even if the State is correct in assuming that the Intergovernmental Tax Immunity Doctrine retains some substantive vitality (beyond the non-discrimination rule) following *New York*, *Baker*, and other cases, the Transitional Reinsurance Program still passes muster under whatever remains of that doctrine.  The State looks to support from *Bessemer City Board of Education v. United States*, 576 F. Supp. 2d 1249 (N.D. Ala. 2008).  There, the Northern District of Alabama assessed a tax challenge from the Bessemer City Board of Education under the Intergovernmental Tax Immunity Doctrine.  *Id.* at 1254.  The court first surveyed the "complicated Supreme Court history of the ever-narrowing intergovernmental tax immunity doctrine."  *Id.*  The court then suggested that the "clearest and most extensive understanding of the Supreme Court's post-*New York* position on the application of the intergovernmental immunity doctrine as it relates to federal taxation of a state agency" was announced in *Massachusetts v. United States*, where the Supreme Court looked principally to the four-justice plurality opinion from *New York* for guidance.  *Id.* at 1255-56.

Thus, under the Alabama district court's gloss on "the modern intergovernmental immunity doctrine," *see id.* at 1255, which looked primarily to *Massachusetts v. United States*, a non-discriminatory federal tax levied directly on the states or their instrumentalities and political subdivisions remains valid "[w]here the subject of [the] tax is a *natural and traditional source of federal revenue* and where it is inconceivable that such a revenue measure could ever operate to preclude *traditional state activities*," *see Massachusetts*, 435 U.S. at 460-61 (emphasis added).  The State implores this Court to adopt that standard to govern this case. (*See* Pls.' Mot. for Summ. J., ECF #18, PageID 164).

This Court disagrees with the tax-immunity standard articulated in *Massachusetts* and relied on in *Bessemer*, because that standard overlooks more modern Supreme Court decisions that reject tests which purport to distinguish between "traditional" and "novel" governmental functions.  *See, e.g.*, *Baker*, 485 U.S. at 524 n.15 (noting that "the essential/nonessential distinction . . . is exactly the type of distinction we concluded was unworkable in *Garcia*"); *Garcia*, 469 U.S. at 546-47 ("We therefore now reject, as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'"); *Brock v. Wash. Metro. Area Transit Auth.*, 796 F.2d 481, 484 & n.6 (D.C. Cir. 1986) (Ginsburg, J.) ("[W]e are uncertain whether the doctrine of state immunity from federal taxation retains any substantive content at all. . . . [because of] the confusion wrought by attempts to create a substantive standard . . . ." (citing *New York*, 326 U.S. at 580-85, and *Garcia*, 469 U.S. at 540-47)).

At bottom, determining whether the subject of a tax constitutes a "traditional source of federal revenue" or whether imposition of such a tax cripples "traditional state activities" requires courts to answer the very type of questions the Supreme Court repeatedly has denounced.  *See Baker*, 485 U.S. at 524 n.15 (citing *Garcia*, 469 U.S. at 542-47).  Even so, if the Court *were* to answer those questions here (as in *Bessemer*), the answers favor the federal government and require the Court to uphold the contributions imposed under the Transitional Reinsurance Program.  For example, *Bessemer* itself upheld the tax penalties in-question because "immunity would most certainly frustrate one of the traditional subjects of federal taxation, namely, the collection of income taxes, and, post-World War II, of social security and Medicare taxes."  *Bessemer*, 576 F. Supp. 2d at 1256.  The court went on to note that it could "in fact . . . think of no more traditional form of federal taxation upon employers."  *Id.*

So too, here.  It goes without saying that the federal government's economic regulation in the areas of employment, health, and welfare constitute a "traditional subject[] of federal taxation."  *See id.*; *see also Travis*, 163 F.3d at 1002 ("[T]he Supreme Court has held that states may be subjected to regulation when they participate in the economic marketplace—for example, by hiring workers covered by the Fair Labor Standards Act." (collecting cases)).  Here, Congress has imposed reinsurance contributions on state and local governments solely through their role as "employers" who participate in the economic marketplace and who establish or maintain employee welfare benefit plans.  That decision suffices even under the State's proposed standard.

More problematically, the State makes *no* argument as to how a contribution imposed for only three years and, in its most expensive year, costs less than $6 million, would "operate to preclude traditional state activities."  *See Massachusetts*, 435 U.S. at 459-60.  Instead, the State merely suggests that "it is by no means 'inconceivable' that federal assessments against states based on a per capita count of state employees *could never grow* to 'preclude' state operations." (Pls.' Mot. for Summ. J., ECF #18, PageID 164 (emphasis added)).  This Court must assess the "tax" as it presently exists, even under the State's preferred standard—not what the State fears, without any record evidence, that tax might someday "grow" to become.

And the "tax" as it presently exists will not "preclude traditional state activities." *Massachusetts* proves the point.  There, the Supreme Court detailed its previous tax-immunity cases in the context of federal employment taxes levied on state employees.  *Massachusetts*, 435 U.S. at 458-59.  The Court noted that this line of cases "culminated in the overruling of *Collector v. Day*," which "involved a nondiscriminatory tax that was imposed not directly on the State but rather on the salary earned by a judicial officer."  *Id.* at 458.  The Court explained that "[n]either *Collector v. Day* itself nor its progeny or precursors made clear how such a taxing

69

measure could be employed to preclude the States from performing essential functions." *Id.* Regardless, in overturning *Collector v. Day*, "the Court demonstrated that an immunity for the salaries paid key state officials is not justifiable." *Id.* The Court continued as follows:

> More significantly, because the taxes imposed were nondiscriminatory and thus also applicable to income earned by persons in private employment, the risk was virtually nonexistent that such revenue provisions could significantly impede a State's ability to hire able persons to perform its essential functions. The only advantage conceivably to be lost by denying the States such an immunity is that essential state functions might be obtained at a lesser cost because employees exempt from taxation might be willing to work for smaller salaries. But that was regarded as an inadequate ground for sustaining the immunity . . . . ***The purpose of the implied constitutional restriction on the national taxing power is not to give an advantage to the States by enabling them to engage employees at a lower charge than those paid by private entities, but rather is solely to protect the States from undue interference with their traditional governmental functions.*** While a tax on the salary paid key state officers may increase the cost of government, it will no more preclude the States from performing traditional functions than it will prevent private entities from performing their missions.

*Id.* at 458-59 (citations omitted) (emphasis added). The same result flows from the Transitional Reinsurance Program, which, at most, increases the cost of hiring and providing healthcare to governmental employees and their dependents during its three years of operation. *See id.*

The State's chief case in this regard, *Bessemer*, recognizes as much. There, the court stated as follows: "To be sure, any payment by the Bessemer Board to the federal government would be a cost to the state and an economic burden that might well affect the traditional state function of education." *Bessemer*, 576 F. Supp. 2d at 1256. "But," the court continued, "as the Supreme Court noted in *Massachusetts*, that economic burden alone 'is not a sufficient basis for sustaining a claim of immunity.'" *Id.* (quoting *Massachusetts*, 435 U.S. at 461). Accordingly, the court upheld the tax penalties in-question. The same result attains in this case too. Thus, even under the State's erroneous view of the continued vitality of the Intergovernmental Tax Immunity Doctrine, the Transitional Reinsurance Program remains constitutional.

In sum, the Transitional Reinsurance Program is constitutional under both the Tenth Amendment and the Intergovernmental Tax Immunity Doctrine because the program regulates state and local governments in their capacity as employers, does not commandeer the legislative or executive apparatuses of state or local governments, and does not discriminate against state or local governments in the contributions imposed.

### IV.  CONCLUSION

For these reasons, the Court **GRANTS** the federal government's Motion to Dismiss (ECF #17) and **DENIES** the State of Ohio's Motion for Summary Judgment (ECF #18).

**IT IS SO ORDERED.**

 **___s/ Algenon L. Marbley_____**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  January 5, 2016**